2020 IL App (1st) 173030
No. 1-17-3030

SECOND DIVISION
December 22, 2020

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court |
| | ) | of Cook County. |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 17 CR 8953 |
| | ) | |
| ANTWAN McNUTT, | ) | |
| | ) | The Honorable |
| Defendant-Appellant. | ) | Ursula Walowski, |
| | ) | Judge Presiding. |

_____

JUSTICE PUCINSKI delivered the judgment of the court, with opinion.
Presiding Justice Fitzgerald Smith and Justice Cobbs concur in the judgment and opinion.

**OPINION**

¶ 1        Defendant, Antwan McNutt, appeals from his conviction for first degree murder (720 ILCS 5/9-1(a)(1) (West 2016)). On appeal, he argues that (1) his waiver of counsel was not effective where he was not mentally competent to waive counsel and where his waiver was not knowing, voluntary, and intelligent, and (2) the trial court erred when it failed to *sua sponte* conduct a separate hearing on defendant's continued competence to waive his right to counsel. For the reasons that follow, we affirm.

¶ 2                                          BACKGROUND

¶ 3         On June 20, 2017, defendant was indicted on two counts of first degree murder (*id.* § 9-1(a)(1), (a)(2)) for the beating death of Charles "Doc" Johnson. At the arraignment on June 28, 2017, when the trial court attempted to advise defendant of the nature of the charges, defendant stated that he did not understand the charges and that he "[d]id not recognize the plaintiff." The trial court then appointed the public defender to represent defendant. As the trial court and defense counsel attempted to set a status date, defendant repeatedly interrupted to state that he wanted to represent himself "pro pern." Despite the trial court's desire to wait until the next court date to address defendant's waiver of counsel, so as to give defendant the opportunity to consult with counsel, defendant persisted in his demand to represent himself immediately.

¶ 4         When the trial court attempted to admonish defendant regarding his waiver of counsel, however, defendant stated that he refused to agree with anything the trial court said because, he claimed, it would be admitting guilt. He again stated that he did not recognize the plaintiff. He went on to claim that he had been held without evidence for five or six months outside of Illinois and he requested that the charges be dismissed on that basis. During this discussion, the trial court attempted to explain the arraignment procedure and the procedure for waiving counsel, but defendant insisted that he did not understand. The trial court then announced that it would order a fitness examination of defendant on the basis that defendant was not responding appropriately and was not being rational. Defendant objected, arguing that he was being responsive but that he refused to represent that he understood what the trial court was saying because that would give the trial court a "verbal contract." Defendant also objected to the trial court's refusal to permit him to waive counsel, and he continued to demand a speedy trial.

¶ 5   On the next court date, the trial court noted on the record that the report of defendant's fitness for trial had been submitted and that it reflected a finding that defendant was, in fact, fit to stand trial. Defendant then indicated that he still wanted to waive his right to counsel and represent himself. The trial court explained that in order to accept defendant's waiver, it would first have to ask him a series of questions to determine that his waiver was knowing and intelligent. The following colloquy then occurred:

"THE COURT: *** So, you know, my question is first of all I have to go over whether or not you really want to represent yourself, can I do that with you?

THE DEFENDANT: Yes, you can.

THE COURT: So how old are you, sir?

THE DEFENDANT: I'm 33 years of age.

THE COURT: And what's your level of education?

THE DEFENDANT: I graduated from high school and I've had two years of college.

THE COURT: Did you have any prior involvement in any legal proceedings where you had—

THE DEFENDANT: Yes, I've been studying a little bit of law.

THE COURT: Okay. But have you actually participated in prior legal proceedings?

THE DEFENDANT: Yes. I got court record to prove that.

THE COURT: Okay. Now, you understand presenting a defense in your case is not just a matter of you telling your story, you understand that, right?

THE DEFENDANT: Yes.

THE COURT: You have to follow various technical rules that govern the conduct of a trial, do you understand that?

THE DEFENDANT: Yes, I do.

THE COURT: Now, a lawyer, like your public defender here, she has substantial experience and training in trial procedure. And the prosecutor here is also an experienced attorney. So they've done this a lot of times, you understand that, correct?

THE DEFENDANT: I'm sure that they are aware of violations.

THE COURT: Right, but you understand that part?

THE DEFENDANT: Yes, I understand.

THE COURT: Your lawyer's experience and training—

THE DEFENDANT: I acknowledge that. I don't like the term understand.

THE COURT: Okay. So I know your lawyer here has probably got at least—I don't want to go over board, 20 years experience in this courthouse, you understand that?

THE DEFENDANT: (Indicating).

THE COURT: Okay. And she's a very capable experienced, good attorney that you have available to you?

THE DEFENDANT: I'm not doubting that.

THE COURT: Okay. All right. Now—and then you understand that someone—if you're unfamiliar with legal procedures, the prosecutor may be able to take advantage of you failing to make some objections—

THE DEFENDANT: That's already been proven—

THE COURT: Okay. You understand that she's more experienced, so if you fail to make certain objections and motions, she could take advantage of that, you understand that?

THE DEFENDANT: I acknowledge that.

THE COURT: And then you may not be able to make effective use of your rights, such as voir diring jurors, how you question jurors, or tactical decisions, some of your tactical decisions may produce unintended consequences, you understand that, right?

THE DEFENDANT: Uh-huh.

THE COURT: Okay. Now, once you—if I do allow you to go *pro se*, understand you're not going to be allowed to complaint [*sic*] about yourself in your o[w]n representation, you understand that?

THE DEFENDANT: (No response).

THE COURT: So if you represent yourself and there is a conviction, if you want to appeal, you can't say, well, I did a bad job, you can't do that on appeal, you understand that?

THE DEFENDANT: I acknowledge that.

THE COURT: A lot of times, a lot of experienced attorneys and judges will tell you that the effectiveness of your defense is really diminished when you're both defendant and your own attorney.

THE DEFENDANT: It doesn't matter, I asked a couple of questions that was pertaining to my case as well, and I still haven't gotten any delay on that, we're still stuck on whether I'm competent or not to stand trial. I asked to see a letter of nobility or a licensed [*sic*] from the prosecuting attorney, and I still haven't gotten that. Also I demanded trial. That was four months ago—

THE COURT: I'm almost done—

THE DEFENDANT: Under the law—

THE COURT: I don't want to cut you off, but let me[ ] go through these, okay. Now, you understand that you're not going to get any special consideration—

THE DEFENDANT: Yes, I do.

THE COURT: Because you're representing yourself.

THE DEFENDANT: I acknowledge that.

THE COURT: And you're not going to receive extra time if you—

THE DEFENDANT: I acknowledge that.

THE COURT:—extra library time, okay. And then you understand with a lawyer, a lawyer could tell you about the existence of possible defenses to your charges, they could talk to the prosecutor and negotiate to reduce charges to lesser penalties, and, you know, in the event of a conviction, they could present things that would lead to a lesser sentence. These are all things a lawyer can do for you, you understand that?

THE DEFENDANT: I acknowledge those things.

THE COURT: And then you're not going to have—once you decide to represent yourself, you're not going to be able to change your mind, you understand that? Once you decide this, then you're representing yourself, you understand?

THE DEFENDANT: (Indicating).

THE COURT: You don't go back, you understand that?

THE DEFENDANT: I understand.

THE COURT: Okay. All right. So—and you understand your charges are very serious. Your charges are charges of murder, which are as charged—all right. This says no enhancement, so it looks like this is 20 to 60 at a hundred percent, State?

MS. LEUIN [(STATE'S ATTORNEY)]: Yes, your Honor.

THE COURT: So as charged, the minimum penalty upon conviction for this murder charge is 20 years to be served at 100 percent time, and it could go up to 60 years to be served at a hundred percent time. So you understand that those are the possible penalties for the charges that the State has levied upon you?

THE DEFENDANT: I acknowledge that.

THE COURT: Okay. All right. So understanding everything, you still want to represent yourself?

THE DEFENDANT: I would like my—

THE COURT: Well, question number one, do you still want to represent yourself?

THE DEFENDANT: Yes, I do. I would like my discovery, though."

The trial court then concluded that defendant would be permitted to proceed *pro se* and granted the public defender leave to withdraw.

¶ 6 During this hearing, defendant pressed on in his demands for a speedy trial, and accordingly, the trial court set a trial date. In the meantime, the trial court directed the State to provide defendant with discovery, including arranging a time to show defendant videos depicting the Johnson's death. With respect to the discovery and the videotapes, defendant stated, "It's been seven months. If they don't have the discovery now, I don't believe that there is one. I believe that this is just foolery with this videotape stuff because that's not even admissible in court." Nevertheless, a status date for a week later was set so that defendant and the State could review the videotapes. Defendant indicated that, during that hearing, he would also like to go over jury instructions.

¶ 7 At the following status date on August 9, 2017, the trial court ascertained that the State was in the process of showing the videotapes to defendant in a back room. During these discussions,

defendant advanced a number of contentions not typically raised in criminal proceedings. Namely, defendant argued that (1) any agreements or pleas entered by counsel on his behalf were void because he never wanted to be represented by counsel; (2) the State was not permitted to simultaneously prosecute and "rule over the case"; (3) he should be allowed to retract his plea because pleas could only be entered if he knew all of the discovery; (4) he reserved his rights under the Universal Commercial Code and thirteenth amendment to not be compelled to perform under any contract that he did not enter into knowingly, voluntarily, or intentionally; and (5) he had not received the "letter of nobility" or "green card" that he requested from the state's attorney. The trial court explained to defendant that the law he cited was not applicable to his case, as it was a criminal case governed by criminal law. The trial court explained that the Universal Commercial Code applied only in civil cases, to which defendant responded, "Okay." He then went on, however, to ask the trial court whether admiralty or common law jurisdiction applied and whether the trial court was "sitting judicially." The trial court explained that it was sitting as a judge in the circuit court of Cook County and that this was a criminal matter governed by criminal law.

¶ 8         At this hearing, defendant also indicated that he wished to "put in" a motion to suppress evidence and quash his arrest but that he could not file a written motion because he was not allowed a pen in his cell and had not been allowed access to the law library, despite the trial court's previous order directing that he be given access. The trial court agreed to provide him with another order for access to the law library. The trial court also explained that if defendant filed a motion to suppress or quash, the trial court would need to address such a motion before they could proceed to trial. Upon learning that, defendant elected to forego a motion to suppress or quash, stating, "I don't—I don't have time to waste. I don't want to waste time." Along those same lines, defendant

objected to the State's request for an additional status date to resolve some evidence issues with the lab, and the trial court acknowledged that defendant was still demanding trial.

¶ 9    On this date, defendant also provided the State with the names of witnesses he intended to call at trial. When the State tendered additional discovery to defendant and asked that defendant sign a receipt for it, defendant refused to do so, saying that he did not want to sign anything.

¶ 10    Defendant returned to court on August 14, 2017, to continue viewing the various videotapes of Johnson's death. During inquiry by the trial court regarding the status of that process, the State represented that about 20 minutes into one of the videos, defendant refused to view anymore. Defendant gave the following explanation for his decision:

"THE DEFENDANT: First and foremost, she [the State's Attorney] let me know that most of these tapes that are being shown, as she calls evidence, are the same thing over and over from different points of view. I care nothing of that.

THE COURT: Okay.

THE DEFENDANT: It's pointless.

THE COURT: Okay.

THE DEFENDANT: She said that she has people that are so-called witnesses in this case. I told her I didn't care too much for that because it's frivolous. You're not proving anything. You still haven't proven anything in this case.

I just want to move it on. I still want to go to trial. I still demand trial, speedy trial, and I want to get on with the proceeding. I feel that this is, you know, nothing more than a stall tactic, as well as the mouth swab. You said I did this, which I did not do, then, where's your evidence? You're using criminals that have been incarcerated that are looking to get money that I also found out and hear through one of the persons that got killed cousins told

me this. He just came from the streets and let me know that some individuals in this person's family is trying to pay anybody to come forward as a witness. Because she's not telling you that this information is all over the Internet.

\*\*\*

\*\*\* I don't—I don't—I'm just—I'm just sick and tired of steady waiting. I'm ready to go."

In response, the trial court directed the State to provide defendant with any outstanding discovery and noted the matter was scheduled for trial. When the trial court asked defendant what he intended to do about the witnesses he wanted to call at trial, defendant stated that he wanted to give their phone numbers to the trial court. When the trial court informed defendant that it could not call his witnesses for him, defendant responded, "Well, come on, then. Don't worry about that. I don't even want no witness. \*\*\* I don't want no witness. Come on."

¶ 11        One more status hearing was held before trial. On that date, defendant stated that he wanted to file a "motion to suppress evidence in violation of knock-and-announce rule." Defendant argued that he was arrested without a warrant and, thus, his post-arrest statement should be suppressed. The trial court advised defendant that a hearing on his motion would be necessary, and that pursuing the motion would toll the time under the speedy trial provisions. After learning that, defendant again decided to forego his motion to suppress, stating that he did not want to do anything that would interfere with the speedy trial calculation.

¶ 12        Defendant also argued that, although the State had produced a lot of documents in discovery, it still had not proven anything. Defendant noted that he had reviewed the documents the State produced and found a lot of inconsistent statements by witnesses and that many of the witnesses identified were incarcerated and had something to gain through their cooperation. The

trial court advised defendant that it was for the jury to determine a witness's credibility but that defendant's review of the discovery would prepare him to cross-examine witnesses at trial.

¶ 13 The trial court also asked defendant if he would like to view any of the other videotapes the State had. Defendant again declined, saying that doing so was pointless and that he just wanted to go to trial.

¶ 14 On the first day of trial, September 12, 2017, before jury selection, the State advised that a formal hearing on defendant's fitness was required by law. Defendant objected on the basis that he wanted to move forward with trial. The trial court advised that, "Well, that's what we want to do. So, apparently we do have to have Dr. Echevarria testify that you're fine, you can go to trial on your own."

¶ 15 While waiting for Dr. Echevarria to arrive in the courtroom, the trial court again asked defendant about his motion to suppress. Defendant argued that his videotaped statement to police following his arrest should be suppressed because he was not informed that it would be recorded or used against him in court. In response, the State represented that it did not intend to use defendant's statement at trial. Accordingly, the trial court concluded it was unnecessary to rule on whether the statement should be suppressed.

¶ 16 The trial court also stated that it wanted to make sure that defendant still wanted to maintain his waiver of counsel and represent himself. To that end, the following colloquy took place:

>"THE COURT: Okay. All right.
>
>Then I do just want to make sure that you still want to represent yourself.
>
>THE DEFENDANT: Yes, I do.
>
>THE COURT: So you understand that if you are found guilty of first degree murder, the sentence would be from 20 to 60.

Is that how you charged it, State?

MS. LEUIN: Yes, 20 to 60, a hundred percent.

THE COURT: So you're charged with first degree murder. If you are found guilty by a jury or a judge, the sentence as charged is 20 to 60 years in the Illinois Department of Corrections and has a period of three years of mandatory supervised release or parole, and you do have to serve a hundred percent of that time.

So you understand your charge and the possible penalties, correct?

THE DEFENDANT: I don't want to say that I understand because I know that—I told you before, I just—let's just agree to disagree or to agree.

THE COURT: Right. Okay. So I just want—do you know—

THE DEFENDANT: I know the fact of these charges here.

THE COURT: You know it?

THE DEFENDANT: Yes.

THE COURT: So that's good. You know what you're charged with. You know what you could get sentenced to if you could get—if you get convicted.

So you understand that—you know, you do have a right for me to appoint an attorney for you to represent you, but it's ultimately your decision whether or not you want to represent yourself or not. So I just want to make sure you thought about that, and you're still staying with your decision—

THE DEFENDANT: Yes, I am.

THE COURT:—to represent yourself.

THE DEFENDANT: I will stay with my decision.

THE COURT: And, Mr. McNutt, I just want to also over go [*sic*] with you that I'm not allowed to help you out during the trial, so I can't be your lawyer.

THE DEFENDANT: Okay.

THE COURT: You have to know the law. You have to proceed as your own attorney. You have to respond or make objections.

THE DEFENDANT: Okay.

THE COURT: That is all on you. I'm not going to appoint somebody in the middle of trial to help you. I'm not a lawyer to help you. So you will not be given any special treatment in front of a jury because you are representing yourself. You understand that, correct?

THE DEFENDANT: Yes, I do.

THE COURT: Okay.

THE DEFENDANT: I also want to let it be known—

THE COURT: Just the other thing is, if there is a verdict of guilty, you can't complain about how you were represented on appeal because you're representing yourself. You understand that, correct?

THE DEFENDANT: No, I do not. I told you I don't—

THE COURT: I mean, do you know that now that I told you that?

THE DEFENDANT: Yes.

THE COURT: Okay. And, once again, Mr. McNutt, I just want to emphasize that it's generally not a good idea to be your own lawyer and the person that is charged. I just want to make sure I'm clear to you that that—you know, that is a big decision to make.

THE DEFENDANT: Yeah. Uh-huh.

THE COURT: You know that?

THE DEFENDANT: Yes, I do.

THE COURT: So you still do not want a lawyer to represent you?

THE DEFENDANT: No, I do not.

THE COURT: You want to represent yourself?

THE DEFENDANT: Yes, I do."

¶ 17    The trial court advised defendant that it had a set of civilian clothes available for him to wear during trial. Defendant declined those clothes, stating that he wanted the jury to see that he was in custody and that it should not matter what he was wearing. In addition, the trial court provided defendant a summary of how the proceedings would progress, from jury selection to verdict, and defendant indicated that he did not have any questions regarding that procedure.

¶ 18    By this time, Dr. Echevarria had arrived in the courtroom. Consistent with his report, Dr. Echevarria, a licensed forensic psychiatrist, testified that defendant was "a very bright person" and responded appropriately and very well to Dr. Echevarria's fitness questions. Defendant was able to articulate and demonstrate his knowledge of the different roles of court personnel and his options in terms of pleading and going to trial. Ultimately, Dr. Echevarria concluded that, to a reasonable degree of medical and psychiatric certainty, defendant was mentally fit to stand trial. This conclusion was "[b]ased on [defendant's] understanding of fitness-related material, including the charge, nature of court process, his understanding of the various courtroom personnel's role and his ability to interact appropriately with [Dr. Echevarria] and engage in the evaluation." When the trial court further inquired of Dr. Echevarria regarding his opinion that defendant was intelligent, Dr. Echevarria testified, "Again, for example, at no point during the interaction did he require repetition of a question posed. His responses were succinct, clear, logical, directed to the questions.

*** I did not have to explain anything to him and it was all readily available in his own mind."
Based on this testimony, the trial court found defendant to be fit to stand trial.

¶ 19    Just before the prospective jurors entered the courtroom, the trial court once again inquired of defendant regarding his educational background. Defendant stated that he graduated from high school with honors and took two years of classes for computer technology and graphic design at the Computer Science Institute in Chicago. In addition, he took classes in African arts and history.

¶ 20    During jury selection, the trial court conducted the examination of the prospective jurors and neither the State nor defendant asked the prospective jurors any additional questions. In chambers, defendant participated in the discussion of which prospective jurors should be kept and which should be struck. More specifically, defendant struck two prospective jurors—one whose mother-in-law was a prosecutor and one who was a retired police officer.

¶ 21    The parties then presented their opening statements. During the State's opening statement, defendant objected but his objection was overruled. Defendant then gave his opening statement. In it, defendant argued that he was not in the area of the crime, that the State falsified evidence, and that the jury should closely examine the evidence. The trial court sustained the State's objections to defendant's arguments that the State is paid money for the people it incarcerates, Johnson's family had "money out on [his] head," his constitutional rights had been violated, and he dreads his nieces and nephews going through the criminal justice system.

¶ 22    Diane Johnson (Diane), Johnson's mother, testified that she last saw Johnson alive on the afternoon of November 27, 2016. She later learned of his death. She identified photos of Johnson in both life and death. During defendant's cross-examination, Diane testified that she knew defendant from the times that he would come to her home to pick up Johnson to go paint houses. Defendant would pick up Johnson in a white van. Defendant also questioned Diane about her

interactions and discussions with the State prior to her testimony and any bias and predispositions she might have in testifying.

¶ 23      Christopher Harris testified next. He testified that in November 2016, he hung out at the intersection of Ashland Avenue and 63rd Street in Chicago (hereinafter, the intersection). At the intersection, there was a green line train station and a liquor store. At that time, Harris knew of defendant from seeing him approximately every other day at the intersection. On the evening of November 28, 2016, Harris first arrived at the intersection when he got off the train. When he arrived, among others, he saw two men, both named CJ, and a woman named Jordan. The talk amongst the people at the intersection was that defendant was looking for Johnson. Harris went home to drop off his bag and then returned to the intersection.

¶ 24      When he returned, Harris saw Johnson lying in the street and defendant standing over him and beating him in the head with a glass bottle while saying gang-related things. Johnson did not defend himself and was just lying in the street. Harris then began to record the beating with his cell phone. One of the men named CJ and Jordan were also recording the events. He testified that he recognized defendant through his clothing, although he had not seen defendant in those clothes before and had not seen defendant earlier that day. He also testified that he recognized defendant by his voice and his face, which was half covered with a mask.

¶ 25      When defendant finished beating Johnson, he threw the bottle at Johnson's face and it broke. Defendant then walked south toward the green line station. Upon recognizing that it was Johnson on the ground, Harris ran to the liquor store at the intersection and told the security guard there to call the police or an ambulance. During questioning by the police, Harris identified defendant as the person who beat Johnson and also identified defendant in security camera footage from the liquor store the evening of Johnson's death.

¶ 26    During his cross-examination of Harris, defendant questioned Harris regarding his prior statement that he did not know what the offender was wearing. Defendant also examined Harris about his motivation to testify and whether he was "working with" the State, had been bribed by the State, and any other bias he might have in giving his testimony.

¶ 27    Irvin Johnson (Irving) testified that on November 28, 2016, he was working security at the liquor store at the intersection. After learning that a murder had occurred in the street outside, Irvin called 911. Irvin also identified video clips and still photos from the liquor store's security camera that evening. In those clips, shortly before the incident outside, a man came into the store, shook Irvin's hand, and then left. A short time later, the man came back inside, said something, and then left again. Irvin did not offer any testimony regarding the identity of the man in the video clips.

¶ 28    On cross-examination, defendant elicited testimony from Irvin that he had met defendant in the liquor store a couple of times before the night at issue.

¶ 29    Officer Guadalupe Cuevas of the Chicago Police Department testified that on November 28, 2016, the officer responded to a call at the intersection and found Johnson lying in the street a few feet from the curb. Johnson was unconscious and did not appear to be breathing. Near Johnson was a shattered vodka bottle. Cuevas helped secure the scene until the evidence technicians arrived. Defendant did not cross-examine Cuevas.

¶ 30    Siretha Woods testified that she was defendant's caseworker and friend at a group home in Chicago where he lived and had known him for three years. Two years prior, she purchased and gave defendant the cellphone he had in November 2016. On the evening of November 28, 2016, at defendant's request, she dropped him off at the intersection. Later that night, she called defendant, but no one answered the first few times she called. The next time she called, however, a person answered and told her that defendant was dead. She hung up and called again, and the

person told her the same thing. She then had her coworker call defendant's cellphone, and her coworker was also told that defendant was dead. Woods then told the person who answered the phone that the phone belonged to her and made arrangements to get it back from him. She learned that the name of the man who had the phone was Charlie Wally. The following day, she met with Wally and retrieved the phone, which was the phone that she had purchased and given to defendant.

¶ 31    When she returned to the group home after retrieving the phone, she saw defendant, who was packing all of his stuff in a bag. She asked him where his phone was, and he said that he lost it. She then told him that she had his phone, and she gave it back to him. Defendant responded that he had to leave town. He said that he had gotten into a fight, someone had tried to stab him, and he needed to leave. After he left, she did not see him again that year.

¶ 32    In January 2017, she met with police where she was shown a video of a man being beaten with a bottle. She recognized defendant in that video by his clothes, voice, build, and the cell phone that dropped out of his pocket. She was also shown the video clips from the liquor store security camera, and she identified defendant as the man in those clips.

¶ 33    On cross-examination, Woods testified that during defendant's stay at the group home, she never noticed any "ill behavior" from him. She also acknowledged that defendant had shown her how things in photos could be changed and that pictures could be taken from other clips.

¶ 34    After Woods was dismissed from the stand, the parties met with the trial court to discuss the order of witnesses who would testify the following day. During that discussion, defendant indicated that he intended to call Woods again the following day, despite having just finished cross-examining her. When the trial court pointed out that Woods had just testified, defendant explained that he wanted to question Woods about his ability to drive because Diane Johnson had testified that defendant would pick up Johnson in a white van to go paint houses. The trial court

permitted defendant to recall Woods to the stand right then for further testimony. Before that, however, the trial court questioned defendant about any other witnesses he might want to call, and defendant indicated that he would like to question the detectives who investigated Johnson's death. The trial court directed the State and defendant to work out any possible stipulations and further directed the State to arrange the appearances of any of the detectives that were available.

¶ 35        Once Woods returned to the stand, defendant elicited testimony from her that she had never observed defendant drive and that, to her knowledge, defendant was unable to drive. She testified that she would drive him everywhere.

¶ 36        In the morning of the second day of trial, before the jury was brought into the courtroom, the trial court noted that defendant had changed his mind and was wearing civilian clothes.

¶ 37        Defendant then raised the issue of his speedy-trial rights, arguing once again that the time to bring him to trial had elapsed. He also asked what the results of the forensic testing were and whether surveillance videos are admissible into evidence. The trial court and State addressed his questions. He also complained that he was not able to "put in" motions, but the State was. The trial court explained that defendant had been given every opportunity to put in any motion he liked, but that on the occasions that he had filed motions, such as his motion to suppress, he had chosen to forego pursuit of them because he did not want to toll the speedy trial clock. The trial court explained that defendant could not simultaneously demand trial immediately and pursue his motions.

¶ 38        Vic Hicks, whose real name was Charles Wally, testified as follows. On the evening of November 28, 2016, he was talking to a friend at the green line station near the intersection. As they were talking, a commotion across the street caught his attention. When he looked up, he saw a man strike another man three times in the head with a glass bottle. The man being struck was

lying on the ground. After the third hit, the bottle broke and the man doing the hitting fled toward the train station. Although he could not see the man's face clearly because the man had a hood up, Hicks knew the man was defendant. Hicks was familiar with defendant, having seen him nearly every day leading up to the attack. In addition, the man was wearing the same jacket Hicks had seen defendant wearing earlier that day.

¶ 39    After defendant fled, Hicks went to the man on the ground, who he identified as Johnson. On the ground next to Johnson was a cell phone. Thinking it was Johnson's, Hicks picked it up. The next morning the phone rang. Still believing the phone belonged to Johnson, Hicks told the woman on the call that he was dead. The woman told him that the phone was hers, and later that morning, Hicks met with and returned the phone to her.

¶ 40    On cross-examination, defendant asked Hicks about whether the police offered him anything during questioning and about the consistency of his account of his conversation with Woods.

¶ 41    Several chain-of-custody witnesses testified without incident.

¶ 42    Rebecca McInerny, a forensic scientist with the Illinois State Police, testified that she tested several pieces of evidence for DNA—two bottle caps, a piece of glass, and fingernail clippings from Johnson. All of the DNA samples found on these pieces of evidence either excluded defendant as a contributor or were not suitable for comparison. Defendant did not cross-examine McInerney

¶ 43    Joseph Worstein, a fingerprint examiner with the Illinois State Police, testified that he did not find any fingerprints on the handle portion of the glass bottle recovered from the scene. Defendant did not cross-examine Worstein.

¶ 44　　　　Before the trial recessed for lunch, the parties and the trial court met to discuss the afternoon's schedule. During that discussion, defendant apologized for his behavior that morning. The trial court stated that it understood that this was a very serious cause, but that it was obligated to respond when defendant claimed he was unable to make any motions. The trial court emphasized that he was free to make any motion he liked. With respect to further testimony, defendant indicated that he intended to testify but not call any other witnesses. The State and trial court informed defendant that Detective Hill was available in the building to be called, as defendant had previously requested. The trial court then asked defendant if he had reviewed the State's proposed jury instructions. Defendant said that he had reviewed them, he did not have any objections, and he did not have any requests for any other instructions.

¶ 45　　　　Dr. Kristin Escobar Alvarenga, an assistant medical examiner with the Cook County Medical Examiner's Office, testified that she conducted an autopsy on Johnson. She testified to the injuries sustained by Johnson. She also testified that, based on her examination, she concluded that Johnson's cause of death was multiple injuries to the head due to an assault with a bottle and that his manner of death was homicide. Defendant did not cross-examine Dr. Alvarenga.

¶ 46　　　　Angelique Young, also known as Jordan Brown, testified as follows. In November 2016, she knew defendant and Johnson from hanging out in the area of the intersection. On the evening of November 28, 2016, she was near the intersection when she saw defendant exit the train. She observed him to be fidgety and angry. He approached her and asked where Johnson was. She gestured in Johnson's direction, and defendant went over to Johnson and started to hit him in the head. She could not see what defendant was hitting Johnson with. She attempted to record the incident but was not able to. Johnson was lying on the ground while defendant was hitting him.

She did not see Johnson hit or try to hit defendant. Defendant hit Johnson more than five times. When he was done, defendant tossed the bottle to the ground and left the scene.

¶ 47        Although defendant was wearing a ski mask that covered half his face, she still knew that it was defendant hitting Johnson because she recognized the exposed portion of his face, his build, his voice, and his clothes. She had no doubt that it was defendant.

¶ 48        On cross-examination, defendant elicited testimony from Young that she had previously met with the State and had been asked the same questions as she was asked at trial and that, during that meeting, she was in custody.

¶ 49        Detective Robert Trotman of the Chicago Police Department also testified. He testified that he was assigned to the investigation of Johnson's death. During that investigation, he recovered two cell phone videos that showed Johnson's beating, along with video from the liquor store and CTA security cameras. Young, Harris, and Woods all identified defendant as the person in the video who beat Johnson. Defendant was ultimately arrested in Wisconsin in February 2017.

¶ 50        On cross-examination, defendant asked Trotman if he purchased McDonald's for Lelon Jones while Jones was at a police station for questioning regarding Johnson's death. Defendant asked if the food was a bribe, given that Jones was homeless. Trotman admitted that the police provided Jones with food from McDonald's during questioning but denied that it was a bribe. Defendant asked Trotman if Jones told officers that if they let him go, he would find out the name of the person who killed Johnson. Trotman denied it, but defendant alluded that such a statement was reflected in a police report.

¶ 51        Defendant also questioned Trotman about why defendant was not informed that he was being videotaped at the time he gave his statement to police. He also asked Trotman about the circumstances of his arrest: whether there was a warrant for his arrest and whether having

defendant's manager bring him outside so the police could arrest him was the equivalent of a "no-knock" rule violation (*i.e.*, defendant argued that police are required to make it known they are in pursuit of someone). Trotman responded that a warrant for defendant's arrest was issued but that he did not know the specific facts of defendant's arrest because he was not present at the time.

¶ 52     After defendant ended his cross-examination, outside the presence of the jury, the trial court asked defendant about his reference to a statement in a police report that Jones had told police that he would find the name of Johnson's attacker if police let him go. The trial court told defendant that it wanted to give him the opportunity to question Trotman about that, if defendant desired, and asked where defendant saw such a statement in discovery. The State denied that Jones ever made any such statement or that any of the reports reflected such a statement by Jones. Defendant insisted that he saw it in the discovery. From the record, it appears that the State and the trial court then scanned some of the police reports until the statement was found to have been made by another individual named Marvin Young. The trial court then gave defendant the opportunity to question Trotman about it.

¶ 53     Defendant questioned Trotman about his questioning of Marvin Young. Trotman testified that, at the time, Marvin Young was under arrest and told officers that he had witnessed Johnson's beating and that, if officers let him go, he would find out who did it. In response to questioning by the State, Trotman testified that Marvin Young's description of the incident was inconsistent with the videos of the incident and that he did not find Marvin Young to be credible.

¶ 54     After the State rested, defendant attempted to call Woods to testify again. The trial court denied that request on the basis that defendant had already been given the opportunity to question Woods, had previously represented that he had no other questions for her and did not intend to call her again, and did not secure her further attendance at trial. Defendant also indicated that he needed

the property that was in his possession at the time of his arrest as evidence in his case. The State, however, represented that defendant's property had been destroyed and that defendant had never previously requested the return of his property.

¶ 55    Defendant then took the stand to testify on his own behalf. Although defendant testified to some facts—he was not present at the attack, he did not kill Johnson, he moved to Wisconsin where he had taken a job, and his personal property was destroyed—much of his purported testimony more closely resembled closing arguments. He stated that the State failed to call witnesses who had stories that were different than what was depicted on the videos, the police did not look into the people whose DNA was found on the bottle, the videos of the attack were tampered with, his speedy trial rights were violated, he was arrested without a warrant, and the State would do anything to get a conviction. Despite the trial court's repeated admonitions that defendant could argue his case during closing arguments and that he was to confine his testimony to facts, defendant persisted in making legal arguments and discussing the law. At one point in his testimony, he referred to the trial court as having "fraudulent admiral jurisdiction," which he described as "the most important and secret protest to keep off the record." He claimed that the trial court and state's attorney would never admit it and had sworn an oath to never reveal it in open court: "You see how they all looking at me, right? They are like oh, my God, he ain't never saying this. It is an oath." Another time, after the trial court told defendant that he could argue his case during closing arguments, defendant responded, "Are you a lawyer? Are you a professional lawyer?" Finally, defendant ended his testimony, stating that he just wanted to argue his case.

¶ 56    On cross-examination, defendant testified that early on November 28, 2016, Woods dropped him off at the intersection, where his cousin picked him up and drove him to Wisconsin. He had accepted a job with Blue Plate Catering in Wisconsin, and he remained in Wisconsin until

his arrest. Defendant denied ever going into the liquor store at the intersection on November 28, 2016, owning the clothes Woods identified as having purchased him, meeting or knowing Johnson, or being the person shown in the videos beating Johnson. Defendant also testified that there was a video of Johnson's beating on the Internet that clearly showed the face of the person who had actually killed Johnson. That person looked completely different than defendant, was taller, and had darker skin. Defendant had seen the man near the intersection, but he did not know the man's name. Defendant testified that he had a printout showing the person in the video. At one point, he testified that he had the printout four months before he was arrested, but then also testified that he had the printout mailed to him. Somewhere along the line, the picture was destroyed.

¶ 57    Defendant then rested.

¶ 58    Prior to closing arguments, the parties and the trial court reviewed the proposed jury instructions. Defendant participated in that discussion, offering objections to some of the instructions. The trial court asked if defendant wished to have the jury instructed on any lesser-included offenses or self-defense, and defendant answered that he did not.

¶ 59    The State gave its closing argument without objection by defendant.

¶ 60    In his closing argument, defendant argued that he was not the offender in this matter and that if he were, his fingerprints or DNA would have been at the scene. He argued that the State was trying to incarcerate him and that, in order to do so, ignored witnesses who would have testified to what really happened, destroyed his property, and tampered with the videos. He argued that the State was exercising "fraudulent admiral jurisdiction that is based out of Washington, D.C." and that "[t]hey are out of their jurisdiction." He argued that his right to a speedy trial was violated, the trial court was practicing law, and the state's attorney did not have a license. He

claimed that the State was trying to strip citizens of their constitutional rights by lying and holding proceedings without him present.

¶ 61   During the State's rebuttal argument, defendant repeatedly objected and offered commentary to the point that the trial court admonished him to behave appropriately.

¶ 62   Following closing arguments, the jury deliberated for 20 minutes before returning a guilty verdict.

¶ 63   At sentencing, the trial court asked defendant if he wished to make any motions for a new trial. Defendant answered that he did not, but he wanted to ask for a "letter or notice of default." He explained that he had wanted to enter a plea of no contest, but the trial court entered a plea of not guilty on his behalf. Accordingly, he wanted to hold the trial court to its judicial determination that he was not guilty. The trial court denied that request.

¶ 64   Defendant also argued that the State had violated his speedy trial rights and violated his due process rights by holding him in custody out of state for six months and arresting him without a warrant or probable cause. He further claimed that the witnesses' testimonies had been "plagiarized" in that their testimonies were not the same as their initial statements, the story did not "add up," only one witness told the truth, and the State bribed witnesses and tampered with evidence. Finally, defendant stated that he did not consent to sentencing. Although defendant did not submit a written motion containing these contentions, the trial court agreed to entertain his oral motion.

¶ 65   In response, the State argued that although defendant was arrested in Wisconsin in February 2017, he fought extradition and was not brought to and placed under arrest in Illinois until the middle of May 2017. The State argued that from that date, taking into account agreed-to continuances while defendant was still represented by counsel and the time during which

defendant's fitness was being evaluated, only 87 days elapsed before the start of trial. The State also argued that defendant was arrested on a warrant and that the evidence of his guilt was overwhelming.

¶ 66    The trial court ultimately denied defendant's motions, specifically stating:

"I found that you proceeded with the trial in an intelligent manner. You had a theory. You made an opening and closing argument. You tried to make arguments during your testimony as a witness, which I precluded you from because that—I did that because that's not the proper time to make arguments during your decision to testify. But I did find that you conducted yourself intelligently, professionally. You asked questions, and the jury ultimately made a decision about everything that was presented to them. And I'm going to respect the jury's decision. That's what their verdict was based on all the evidence that was presented to them."

¶ 67    Prior to proceeding to sentencing, the trial court gave defendant the opportunity to review the presentence investigation, which defendant did. When asked if he had any corrections to the report, defendant stated that he had no recollection of one of the reflected juvenile charges, which the State agreed to strike from the report.

¶ 68    Defendant then renewed his request for a "notice of default," which the trial court again denied. In response, defendant stated that he did not want to move forward with the sentencing proceedings and that he did not give his consent to proceed or be in the courtroom. He continued to insist that the case be dismissed on the basis that there was no evidence against him and that the State had lied. As the trial court continued to tell defendant that it had already ruled on his requests, defendant appeared to become more agitated.

¶ 69     During Diane Johnson's testimony in aggravation, defendant interjected with objections and commentary. After her testimony, when the trial court asked if defendant had any evidence he would like to present, defendant stated that he would like the State and the trial court "to show me a letter of nobility or a green card to practice law in the state." During the State's sentencing argument, defendant repeatedly interrupted, asking what proof the State had and what his intent in killing someone would be. He also told the State that it deserved an academy award. In his argument, defendant argued that there was insufficient evidence to support his conviction, his constitutional rights had been violated, evidence was falsified, and he was entitled to see a letter of nobility or green card for the state's attorneys.

¶ 70     As the trial court attempted to proceed with sentencing, defendant continued to interrupt, calling the state's attorneys liars, stating that he did not care and that the trial court would do whatever it wanted, arguing that the trial court would not grant any of his motions, and proclaiming that he did not give consent to any further proceedings. On two occasions, he requested that his birth certificate and social security card be entered into the record because he would not take responsibility for the case, he was a "true and living person," and he was "not dead or lost at sea."

¶ 71     The trial court ultimately sentenced defendant to 50 years' imprisonment and admonished him as to his rights to appeal. When asked if he understood his rights to appeal, defendant stated that he did not understand because he did not speak legalese. When defendant again complained that State's motions were always granted and his were not, the trial court directed that defendant be brought back to the holding cell. Defendant responded with a profanity-laced outburst and the proceedings were concluded.

¶ 72     Defendant then instituted this appeal.

¶ 73                                    ANALYSIS

¶ 74          On appeal, defendant argues that (1) his waiver of counsel was not effective where he was

not mentally competent to waive counsel and where his waiver was not knowing, voluntary, and

intelligent, and (2) the trial court erred when it failed to *sua sponte* conduct a separate hearing on

defendant's continued competence to waive his right to counsel. We note that some of defendant's

arguments on appeal are difficult to precisely pin down, in that they are not clearly defined or

explained or are not consistently maintained throughout this appeal. Nevertheless, we have

attempted to address all substantive aspects of defendant's contentions, and we discuss each in

turn.

¶ 75                          Knowing and Intelligent Waiver

¶ 76          Defendant first argues on appeal that his waiver of counsel was not knowing, voluntary,

and intelligent because the trial court did not properly admonish him pursuant to Illinois Supreme

Court Rule 401(a) (eff. July 1, 1984) until the first day of trial, after he had already been allowed

to proceed *pro se*; the trial court did not properly assess defendant's competence to waive counsel

and ability to represent himself; and defendant was not competent to waive counsel and did not

waive counsel knowingly, voluntarily, and intelligently. We disagree with each of these

contentions.

¶ 77          Although defendant did not preserve the issue of the effectiveness of his waiver of counsel,

we review his claim under the plain-error doctrine, as it raises the question of whether defendant

was denied a substantial right. *People v. Jiles*, 364 Ill. App. 3d 320, 328 (2006).

¶ 78          Just as a criminal defendant has the right to the assistance of counsel, he also has the right

to proceed without counsel under the sixth amendment of the United States Constitution. *People

v. Haynes*, 174 Ill. 2d 204, 235 (1996). The right to self-representation is just as fundamental as

the right to be represented by counsel. *Id.* Even where a defendant's decision to represent himself might be unwise, it must be honored out of respect for the individual. *Id.* To effectively waive counsel and proceed to represent himself, a defendant's waiver must be knowing, intelligent, and voluntary. *Id.*

¶ 79        Under Rule 401(a), a defendant who wishes to waive counsel must be given certain admonishments before his waiver can be considered knowing, intelligent, and voluntary. To that end, Rule 401(a) provides:

> "(a) Waiver of Counsel. Any waiver of counsel shall be in open court. The court shall not permit a waiver of counsel by a person accused of an offense punishable by imprisonment without first, by addressing the defendant personally in open court, informing him of and determining that he understands the following:
>
> (1) the nature of the charge;
>
> (2) the minimum and maximum sentence prescribed by law, including, when applicable, the penalty to which the defendant may be subjected because of prior convictions or consecutive sentences; and
>
> (3) that he has a right to counsel and, if he is indigent, to have counsel appointed for him by the court." (Emphasis omitted.) Ill. S. Ct. R. 401(a) (eff. July 1, 1984).

Although compliance with Rule 401(a) is necessary for an effective waiver of counsel, strict compliance is not required. *Haynes*, 174 Ill. 2d at 236. "Rather, substantial compliance will be sufficient to effectuate a valid waiver if the record indicates that the waiver was made knowingly and voluntarily, and the admonishment the defendant received did not prejudice his rights." *Id.*

¶ 80        In his opening brief, defendant makes the conclusory statement that the trial court did not substantially comply with Rule 401(a). He also argues in his opening brief that a complete set of

admonitions under Rule 401(a) was not given to him until the first day of trial, which was too late, as he had already been permitted to proceed *pro se*. These contentions suggest, of course, that defendant believes the admonishments the trial court provided on August 1, 2017, were substantively deficient in some way. Defendant does not explain in his opening brief, however, how they were deficient, except to say that his repeated interruptions of the admonishments "call[ed] into question whether the judge adequately conveyed and [defendant] understood the right to counsel that he was waiving." In contrast, however, in his reply brief, defendant states that the gravamen of his claim "is not, as the State argues, that the trial court did not speak the words required by [Rule 401(a)]" but was, instead, that his waiver was not knowing and intelligent. In fact, he also states that on August 1, 2017, "as noted in [defendant's] opening brief, the trial court spoke the words required by [Rule 401(a)]." Despite these statements at the beginning of his reply brief that he did not contest the adequacy of the admonishments (the effectiveness of defendant's waiver being a separate issue addressed below) given on August 1, 2017, defendant then states towards the end of his reply brief that admonishments were "provided on the first day of trial and thus were woefully tardy."

¶ 81    From these inconsistent arguments, it is impossible to ascertain whether defendant actually intends to argue that the trial court's admonishments on August 1, 2017, were somehow substantively deficient. Given that he fails to clearly identify any substantive deficiency in the admonishments the trial court provided on August 1, 2017, but does clearly state in his reply brief that he does not contest the sufficiency of the August 1, 2017, admonitions and acknowledges that on that date the trial court gave the admonitions required under Rule 401(a), we are compelled to conclude that defendant either never intended to pursue or has chosen to abandon any claim that the August 1, 2017, admonitions were substantively deficient. Even if defendant did intend to

pursue such a claim, his failure to identify and argue what, exactly, was allegedly deficient about those admonishments precludes us from concluding that the trial court did not properly admonish him on August 1, 2017. See Ill. S. Ct. R. 341(h)(7) (eff. Nov. 1, 2017) (requiring that the argument section of appeals briefs "shall contain the contentions of the appellant and the reasons therefor, with citation of the authorities and the pages of the record relied on"); *Sakellariadis v. Campbell*, 391 Ill. App. 3d 795, 804 (2009) ("The failure to assert a well-reasoned argument supported by legal authority is a violation of Supreme Court Rule 341(h)(7) [citation], resulting in waiver."); *Thrall Car Manufacturing Co. v. Lindquist*, 145 Ill. App. 3d 712, 719 (1986) ("A reviewing court is entitled to have the issues on appeal clearly defined with pertinent authority cited and a cohesive legal argument presented. The appellate court is not a depository in which the appellant may dump the burden of argument and research.").

¶ 82      Because we have no reason to question the substantive sufficiency of the August 1, 2017, admonishments, we cannot agree that defendant was not admonished under Rule 401(a) until the first day of trial on September 12, 2017. Thus, defendant's contention that he was not admonished under Rule 401(a) until after he was permitted to proceed *pro se* must fail.

¶ 83      Although we have no basis on which to conclude that defendant was not properly admonished under Rule 401(a), we must still address whether defendant's waiver of counsel was effective. After all, although proper admonishments under Rule 401(a) are a necessary prerequisite to a conclusion that a defendant's waiver was knowing, voluntary, and intelligent, Rule 401(a) admonishments are not, alone, sufficient to establish that a defendant's waiver was effective. Accordingly, we turn to defendant's contentions that the trial court did not properly assess his competence to waive counsel and ability to represent himself and that he was not competent to waive counsel and did not waive counsel knowingly, voluntarily, and intelligently.

¶ 84    As stated above, to be effective, a defendant's waiver of counsel must be knowing, voluntary, and intelligent. *People v. Kidd*, 178 Ill. 2d 92, 104 (1997). In assessing whether a defendant's waiver was knowing and intelligent, our supreme court has offered the following guidance:

> "Although a defendant need not possess the skill and experience of a lawyer in order competently and intelligently to choose self-representation, he should be made aware of the dangers and disadvantages of such representation, so that the record will establish that he knows what he is doing and his choice is made with eyes open. [Citations.] The requirement of knowing and intelligent choice calls for nothing less than a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. [Citations.] The determination of whether there has been an intelligent waiver of the right to counsel must depend, in each case, upon the particular facts and circumstances of that case, including the background, experience, and conduct of the accused." (Internal quotation marks omitted.) *Id.* at 104-05.

We are to consider the entire record in determining whether a defendant's waiver of counsel was knowing and intelligent. *People v. Redd*, 173 Ill. 2d 1, 21 (1996). "A defendant's background, experience and conduct are all factors to consider when determining if a valid waiver of counsel has been made." *Id.*

¶ 85    It is well established that we will reverse the trial court's determination that defendant effectively waived his right to counsel only if the trial court abused its discretion. *People v. Lopes*, 2019 IL App (5th) 170258, ¶ 22. "It is axiomatic under Illinois law that an abuse of discretion exists only if the trial court's decision is arbitrary, fanciful, or unreasonable to such an extent that no reasonable person would agree with the decision." *Id.*

¶ 86        With respect to his contention that the trial court failed to properly assess and ascertain his competency to waive counsel and his ability to represent himself, defendant argues the trial court allowed him to waive counsel before the hearing on his fitness to stand trial, equated his fitness to waive counsel with his fitness to stand trial, and failed to formally inquire into and assess his competency and abilities. We disagree that any of these contentions require reversal.

¶ 87        Defendant is correct that the trial court accepted defendant's waiver of counsel on August 1, 2017, but did not hold a formal hearing on defendant's fitness to stand trial until September 12, 2017. We do not find this to be a fatal defect, however, because it is clear from the record that Dr. Echevarria conducted his examination and assessment prior to August 1, 2017, Dr. Echevarria submitted his report finding defendant fit to stand trial prior to August 1, 2017, there were no objections to or concerns about the finding of fitness when it was discussed by the parties and the trial court on August 1, 2017, and Dr. Echevarria's testimony at the hearing on September 12, 2017, was based on the evaluation he conducted of defendant prior to August 1, 2017. There was no substantive challenge, either in the trial court or now on appeal, to defendant's fitness to stand trial. Thus, everything in the record indicates that defendant had been determined to be fit before and as of the time that he waived counsel on August 1, 2017. The hearing on September 12, 2017, simply satisfied a statutory formality but did not establish or alter the conclusion that defendant was fit to stand trial as of August 1, 2017. Accordingly, although it would have been preferable and created a cleaner record to hold the fitness hearing before the trial court accepted defendant's waiver of counsel, we do not believe that the mere fact that it chronologically followed defendant's waiver of counsel requires a conclusion that defendant could not effectively waive counsel where he was assessed fit to stand trial prior to his waiver.

¶ 88            Defendant also argues that the trial court "may have" equated defendant's fitness to waive counsel with his fitness to stand trial. Defendant's argument is based on the trial court's single statement that, "So, apparently we do have to have Dr. Echevarria testify that you're fine, you can go to trial on your own." First, although the trial court's statement of "you can go to trial on your own," without context, could be understood to refer to defendant's ability to represent himself without counsel, taken in the appropriate context, we think it apparent that the trial court was referring to defendant's fitness to stand trial. The trial court ordered Dr. Echevarria to assess only defendant's fitness to stand trial, not his competence to waive counsel. Dr. Echevarria's report and his testimony addressed only defendant's fitness to stand trial, not his competence to waive counsel. After Dr. Echevarria's testimony, the trial court specifically stated that it was satisfied that defendant was fit to stand trial and made no mention of defendant's competence to waive counsel. Accordingly, when properly read in context, it is apparent to us that the trial court viewed Dr. Echevarria's testimony and assessment to relate only to defendant's fitness to stand trial, not his competence to waive counsel.

¶ 89            Moreover, defendant's concern with the equation of defendant's fitness to stand trial with his fitness to waive counsel comes from his belief that a higher standard of competence applies when a defendant is waiving counsel rather than standing trial. In support, defendant cites to *Indiana v. Edwards*, 554 U.S. 164, 167 (2008), in which the United States Supreme Court was faced with the question of whether a trial court could force a defendant who wished to proceed *pro se* to go to trial with counsel where the defendant was fit to stand trial but was not mentally competent to conduct the trial himself. The Court concluded that in such circumstances:

                "the Constitution permits judges to take realistic account of the particular defendant's
                mental capacities by asking whether a defendant who seeks to conduct his own defense at

trial is mentally competent to do so. That is to say, the Constitution permits States to insist upon representation by counsel for those competent enough to stand trial under *Dusky [v. United States*, 362 U.S. 402 (1960) (*per curiam*),] but who still suffer from severe mental illness to the point where they are not competent to conduct trial proceedings by themselves." *Edwards*, 554 U.S. at 177-78.

¶ 90    Defendant infers from *Edwards* that, in all cases, a defendant's competency to waive counsel must be assessed independently of his competency to stand trial. Although we agree that *Edwards* stands for the proposition that a defendant who is found fit to stand trial is not necessarily and automatically also mentally competent to waive counsel during trial,[1] we do not agree that *Edwards* requires that a higher or different standard of competency be applied to every defendant before he or she is permitted to waive counsel. Rather, *Edwards* simply held that in cases where a "gray-area" defendant has been found fit to stand trial but exhibits "severe mental illness" that affects his or her competency to conduct trial, the trial court may consider the specific facts and circumstances of the case to determine whether that defendant is, in fact, competent to waive counsel and conduct trial on his own. See *People v. Allen*, 401 Ill. App. 3d 840, 851 (2010) ("*Edwards* did not hold there was a higher standard of competence requiring an additional inquiry before a trial court permitted a defendant to proceed *pro se*. Rather, *Edwards* simply held that a defendant's right to self-representation was not absolute and could be limited if a defendant was

_____

[1]Notably, the *Edwards* Court distinguished *Godinez v. Moran*, 509 U.S. 389 (1993). In *Godinez*, the "borderline-competent criminal defendant" sought to waive counsel and plead guilty, and the trial court permitted him to do so. The United States Supreme Court held that no error occurred, rejecting the notion that a higher or different standard of competence applied to a defendant wishing to waive counsel or plead guilty than did to a defendant's ability to stand trial. *Id.* at 398-99. The *Edwards* Court concluded that *Godinez* did not answer the question in *Edwards* because *Godinez* involved a defendant who wished only to plead guilty on his own, not conduct trial proceedings, and because *Godinez* only considered whether a "gray-area" defendant may be permitted to represent himself, not whether he could be denied the right to represent himself. *Edwards*, 554 U.S. at 173-74.

not mentally competent to proceed *pro se*, yet was still competent to stand trial with representation."); *People v. Tatum*, 389 Ill. App. 3d 656, 670 (2009) (same).

¶ 91    Moreover, *Edwards*, by its own terms, applies to only those cases where the defendant exhibited "severe mental illness" that would impact his ability to represent himself at trial. Here, there is no evidence that defendant suffered from a mental illness—severe or otherwise. Although defendant argues on appeal that the unusual and bizarre legal theories he espoused in the trial court indicate that he was not competent to represent himself, as we will discuss below, we disagree that holding unusual legal positions necessarily indicates mental illness.

¶ 92    Defendant also claims that the trial court erred when it failed to conduct a separate hearing on his competency to waive counsel and did not properly inquire into his ability to effectively and competently waive counsel. According to defendant, the trial court's inquiry into and assessment of his competence and ability to waive counsel consisted only of inquiring into defendant's age and educational background. Defendant does not, however, cite any authority for the proposition that the trial court was required to conduct a specific examination or hold a separate hearing to assess defendant's competency to waive counsel other than *Edwards*, and as discussed above, *Edwards* imposes no such requirement. Moreover, the record demonstrates that the trial court, among other things, inquired into defendant's age, education, and legal experience; admonished him according to Rule 401(a); and thoroughly advised him of potential pitfalls in representing himself. Defendant does not explain why this inquiry was procedurally deficient, what else the trial court was required to do, or how further inquiry would have altered defendant's waiver of counsel. See Ill. S. Ct. R. 341(h)(7) (eff. Nov. 1, 2017) (requiring that the argument section of appeals briefs "shall contain the contentions of the appellant and the reasons therefor, with citation of the authorities and the pages of the record relied on"); *Sakellariadis*, 391 Ill. App. 3d at 804

("The failure to assert a well-reasoned argument supported by legal authority is a violation of Supreme Court Rule 341(h)(7) [citation], resulting in waiver."); *Thrall Car Manufacturing Co.*, 145 Ill. App. 3d at 719 ("A reviewing court is entitled to have the issues on appeal clearly defined with pertinent authority cited and a cohesive legal argument presented. The appellate court is not a depository in which the appellant may dump the burden of argument and research."). Accordingly, we find no error in the form of the trial court's inquiry.

¶ 93     Defendant's true dispute appears to be with the trial court's conclusion that he was competent to waive counsel and that he did so knowingly, voluntarily, and intelligently. Although a defendant's competency to waive counsel and whether he executed an effective waiver of counsel are distinct issues, defendant's arguments on these issues are intermixed and nearly identical. Accordingly, we address them simultaneously.

¶ 94     According to defendant, he lacked the competency to waive counsel and his waiver was not effective because he did not understand or value the role of counsel, lacked legal sophistication, and espoused bizarre and legally unsound theories. Defendant argues this was evidenced by his frequent interruptions of the trial court, his preoccupation with his speedy trial rights, his belief that the State was required to produce a "letter of nobility" or license to practice, his belief that the State could not prosecute him in the absence of a contract with him, his contention that his plea of not guilty was void because it was entered by counsel at a time when he wanted to act *pro se*, his reference to his "rights" under the Uniform Commercial Code and the thirteenth amendment, his decision to forego a motion to suppress and a motion for substitution of judge in the name of proceeding to trial faster, his decision to not view all of the videos of the incident or to secure the attendance of witnesses, his choice to wear his jail uniform on the first day of trial, and his overall behavior leading up to trial.

¶ 95        We disagree that any of this—individually or taken together—demonstrates that defendant was not mentally competent to waive counsel or that his waiver of counsel was not voluntary, knowing, or intelligent. First, we disagree that defendant's behavior or theories evidence a lack of understanding that the role of defense counsel is to present defendant's case, test and refute the State's case, and work to protect defendant's right to a fair trial. Rather, defendant's behavior and legal theories simply evidence his lack of legal knowledge, experience, and training. To that extent, defendant is correct that his behavior and legal theories evidence a lack of legal sophistication on his part.

¶ 96        Unsurprisingly, however, defendant does not cite any caselaw that supports a conclusion that a defendant must possess a minimum level of legal acumen to be considered competent to effectively waive counsel. This is likely because existing caselaw clearly holds that a lack of legal sophistication, knowledge, or experience—manifested in the form of unsupported legal theories, unsuccessful strategies, and unwise tactical decisions—is not a basis on which to find a defendant incompetent to waive counsel or his waiver of counsel ineffective. See *Redd*, 173 Ill. 2d at 24 (the defendant's numerous, rambling motions showed a lack of comprehensive knowledge of the law and principles of criminal procedure but were not indicative of his competence to waive counsel); *Allen*, 401 Ill. App. 3d at 851-53 (the defendant's bizarre defense to the charge that he murdered his sister—that his nonbiological father was responsible for the disappearance of many people over a span of years and that his biological father left him a trust, which defendant's family kept a secret from him—was a poor choice for a defense because it was unsupported by the evidence, but it did not indicate a lack of mental competence on the part of the defendant); *Tatum*, 389 Ill. App. 3d at 670-71 (concluding that the defendant's numerous interruptions and his theory that everyone was trying to frame him did not render him incapable of effectively waiving counsel but instead were

the result of "a nonlawyer defending himself" and "defendant's possible frustration of his lack of legal knowledge"); *People v. Palmer*, 382 Ill. App. 3d 1151, 1158 (2008) (stating that the "gibberish" in the defendant's motions did not alter the court's determination that defendant was able to effectively waive counsel: "We explicitly reject defendant's contentions that any deficiencies in his *pro se* representation lend any support whatsoever to his claim that he was somehow not fit to waive his right to counsel."); see also *United States v. James*, 328 F.3d 953, 955 (7th Cir. 2003) (noting that espousing ludicrous legal positions does not necessarily render a person incompetent to understand and participate in legal proceedings).

¶ 97       We note that if a lack of legal sophistication or the advancement of unsupported legal theories, unsuccessful trial strategies, and unwise tactical decisions were a basis on which to conclude that an individual is not competent to conduct court proceedings, it would be nearly impossible for any non-legally trained criminal defendant to exercise his or her right to self-representation. The fact that defendant lacked the legal knowledge and experience to make successful arguments and tactical decisions that were supported by existing law and the evidence in the case simply demonstrates what has been long known and repeated in the context of self-representation—the decision to represent oneself is not wise or prudent. See, *e.g.*, *Palmer*, 382 Ill. App. 3d at 1158 ("Ten years ago, this court noted that 'a defendant's decision to represent himself is universally viewed as unwise' [citation], and we adhere to that opinion."). No matter how unwise such a decision may be, however, courts are obligated to respect a defendant's decision to exercise his right to self-representation. See, *e.g.*, *Haynes*, 174 Ill. 2d at 235 ("Although a court may consider the decision unwise, a defendant's knowing and intelligent election to represent himself must be honored out of that respect for the individual which is the lifeblood of the law." (Internal quotation marks omitted.)).

¶ 98        Moreover, although some of defendant's contentions in the trial court lacked legal support and some of his tactical decisions were not prudent, they were not so out of touch with reality as to suggest that defendant was incapable of making a sound decision to represent himself, nor were all of his decisions as baseless or bizarre as he now contends. For example, although defendant's decision to focus almost exclusively on his speedy-trial rights prompted him to forego additional discovery and motion practice and to frequently interrupt the trial court—a decision that was unwise in a number of respects—it does not suggest anything other than defendant made a poor tactical decision. Moreover, in attempting to advance his speedy-trial claim, defendant evidenced an ability to understand, assess, and think critically about somewhat complicated legal concepts. His comments evidence an understanding that the State had a limited amount of time to bring him to trial and that his actions or agreements could toll the calculation of that time. In fact, he argued that the four-week continuance agreed to by the public defender following arraignment was void and should not be counted against his speedy trial calculation because he did not consent to that continuance. Similarly, defendant's choice to forego viewing all of the videotapes of the incident, although arguably unwise, suggests nothing more than a certain level of impatience on defendant's part; per his own clear explanation, he chose not to view all of the videos because, in his opinion, they all showed the same thing over and over. Moreover, it is also clear from his questioning of witnesses that defendant had, in fact, thoroughly reviewed much of the discovery produced to him by the State, as he was able to question many of them about prior statements they made to police, bias, and the statements of uncalled witnesses. His refusal to sign a receipt acknowledging that the State had provided him with discovery does not appear to have been a wholesale rejection of discovery on his part but instead a fear of making some sort of admission. Defendant's references

to admiralty jurisdiction, contracts with the State, the Uniform Commercial Code, letters of nobility, and the thirteenth amendment simply exhibit a lack of legal knowledge.

¶ 99    Defendant is not an individual who exhibited behavior that suggests a detachment from reality or a belief that he was living in an altered or fictional reality. Nor is defendant an individual who was unable to interact with others appropriately or communicate effectively. He simply got the law wrong and made poor strategic decisions. Even among licensed, experienced, practicing attorneys, unwise and unsuccessful tactical decisions, impatience, and incorrect legal reasoning abound. Most certainly, it is to be expected from a person untrained and inexperienced in the subtleties, procedures, and nuances of the law. Again, if we were to hold that poor strategic decisions, impatience, and a lack of complete and correct understanding of the law were enough to deem a defendant incompetent to represent himself at trial, it would essentially eliminate the right to self-representation for nearly all criminal defendants. We cannot agree that such should be the result.

¶ 100    We think it important to note that, in addition to providing defendant with the basic admonishments under Rule 401(a), the trial court took great care to warn defendant of the potential pitfalls of representing himself and the benefits of counsel. Specifically, the trial court advised defendant that he would be required to follow technical rules; the state's attorney was very experienced and could capitalize on any missteps he took; the attorney who defendant was foregoing was very experienced and capable; defendant's tactical decisions could have unintended, negative consequences; the effectiveness of defendant's defense would likely be diminished if he represented himself; counsel could help defendant identify defenses, negotiate with the State, and present evidence that could mitigate a potential sentence; and representing himself was just generally not a good idea.

¶ 101      Defendant acknowledged all of these potential pitfalls, and nothing in the record suggests that defendant's acknowledgements were anything but genuine and understanding. The trial court inquired into defendant's age, education, and legal experience, none of which indicated a lack of competency or understanding on his part. Defendant was well into adulthood, had completed high school and some postsecondary education, and had a criminal record that suggested at least some experience within the system. Moreover, defendant interacted with the trial court and other court staff appropriately and answered questions lucidly.

¶ 102      Finally, we observe that not only did defendant perform all the basic tasks of representing himself at trial, but he also was able to perform some more legally advanced tasks, all of which belies his claim that he was incompetent to represent himself. On the most basic level, defendant engaged in meaningful discussions regarding the selection of jurors, including striking two jurors for logical reasons; gave an opening statement and closing argument; cross-examined witnesses, including drawing out potential bias and inconsistent statements; registered objections to the State's questions to witnesses; testified on his own behalf; and participated in the jury instructions conference. On a more specific and advanced level, defendant demonstrated an understanding of the effect of defendant-requested and by-agreement continuances on his speedy trial claim, requested that the four-week continuance agreed to by the public defender be considered void because he did not consent to it, made repeated demands for dismissal based on his speedy trial claim, repeatedly requested and received orders to access the law library at the jail, filed a motion for substitution of judge, requested to change his plea to no contest until he received all of the discovery, corrected the misspelling of his name, made an oral motion to suppress and quash his arrest, objected to the State's request for a buccal swab, identified two potential trial witnesses, objected to the State's request for a DNA consumption order, filed another motion to suppress

based on a claimed violation of the knock-and-announce rule, identified inconsistent witness statements in discovery and impeached trial witnesses with those statements, argued that all evidence should be suppressed on the basis that he was arrested without a warrant, moved to suppress his statement to police on the basis that he was not informed his statement would be recorded, objected to photographs that he claimed were unclear, argued the indictment contained an insufficient number of signatures, complied with the State's motion *in limine* that no mention of potential punishment be made in front of the jury, objected to the admission of certain State evidence at trial, objected to the State's questioning of witnesses in a leading manner, impeached Diane regarding her testimony that he would pick up Johnson with other evidence that he did not drive, and declined jury instructions on second-degree murder and self-defense because he maintained his claim that he was not present at Johnson's death. We also observe that, during trial, defendant was not disruptive in any manner.

¶ 103 In addition, defendant presented coherent—even if not supported by the evidence or precisely articulated—defense theories that he consistently maintained throughout trial. He argued that (1) he was not present at the scene of the incident when it occurred but was instead in Wisconsin, (2) there was no fingerprint or DNA evidence linking him to the crime, (3) the video of the incident had been altered, and (4) the witnesses who testified against him were not credible due to their biases and/or inconsistent statements. Again, although defendant did not perform the above-identified tasks as effectively or proficiently as a trained attorney might have and although his arguments lacked legal or factual merit, he nevertheless performed the tasks and raised his contentions in such a way as to demonstrate that he was mentally competent to represent himself.

¶ 104 Given defendant's background, education, and experience in the legal system, his interactions with the trial court and attorneys, the trial court's thorough admonishments of

defendant regarding the wisdom (or lack thereof) and pitfalls of representing himself and defendant's acknowledgement of those admonitions, defendant's meaningful participation in the proceedings, defendant's performance of the basic necessary tasks (and then some) in representing himself at trial, and the trial court's superior ability to observe and assess defendant's behavior and interactions, we conclude that the trial court did not abuse its discretion in concluding that defendant was competent to waive counsel and knowingly, voluntarily, and intelligently did so. See *Redd*, 173 Ill. 2d at 22-23 (rejecting the defendant's contention that he lacked the capacity to make a knowing waiver of counsel where the trial court had ample opportunity to observe and assess the defendant's ability to make a knowing waiver of counsel, the defendant demonstrated a rational understanding of the charges and possible penalties, the defendant coherently participated in all phases of the pretrial and trial proceedings and responded lucidly to the judge, and the defendant filed numerous motions, examined witnesses, and actively presented a defense); *Allen*, 401 Ill. App. 3d at 852 (although there existed deficiencies in the defendant's self-representation, they were the result of the defendant not being an attorney; because the defendant was able to perform all of the basic tasks necessary to present his defense—making an opening statement and closing argument, cross-examining witnesses, entering exhibits, objecting to witness testimony, and submitting jury instructions—and was able to articulately and lucidly participate in discussions with the trial court and prosecution, the court would not substitute its judgment for the trial court's assessment that the defendant was competent to waive counsel); *Tatum*, 389 Ill. App. 3d at 670-71 (although the defendant's self-representation might have been foolish and unwise and although the defendant did not perform the tasks as effectively as an attorney might have, the defendant was able to perform all of the basic trial tasks—participating in *voir dire*, giving opening and closing

statements, cross-examining witnesses, and testifying on his own behalf—thus supporting the trial court's conclusion that he was mentally competent to waive counsel).

¶ 105                                    Ongoing Obligation

¶ 106        Defendant also argues on appeal that the trial court had an ongoing obligation to assess his continued competency to represent himself and that the trial court erred when it failed to *sua sponte* order a hearing to assess defendant's continued competency based on defendant's conduct during trial. Once again, defendant failed to properly preserve this issue for review. However, because defendant argues that we should review it under plain error and because the State has not objected to that request, we will address it on the merits.

¶ 107        Defendant's argument in this respect is again based on the belief that *Edwards* requires the application of a higher standard of competence in assessing a defendant's competency to waive counsel than the standard used to assess a defendant's fitness to stand trial. For the reasons that we discussed above, we reject that contention. Nevertheless, because we acknowledge and agree that a defendant's competency can change over the course of time, we do not dispute that the trial court has an ongoing obligation to be aware of any potential signals that a defendant's competence has diminished. That being said, we do not agree that any such signals were present in this case.

¶ 108        As in his initial argument, defendant contends that his competence to waive counsel was lacking because he declined to view all the videotapes and otherwise expressed disinterest in conducting thorough discovery and pursued a speedy-trial argument at the expense of other arguments and motions. In addition, defendant argues that the trial court should have questioned his continued competence based on his raising a legally and factually baseless motion to suppress, a legally and factually baseless speedy trial claim, a factually unsupported defense that he was in Wisconsin and the video had been altered, his ineffective cross-examination of State witnesses,

and his references to his "nonsensical" legal theories during his closing argument, which resulted in numerous objections from the State and admonitions from the trial court.

¶ 109    For all the same reasons that we discussed above, we disagree that defendant exhibited any lack of competence that would have required the trial court to reassess the validity of his waiver of counsel. As before, all of the evidence of defendant's alleged incompetence to waive counsel is simply evidence of defendant's lack of legal knowledge, experience, and training. His disregard for the importance of viewing every video and pursuing thorough discovery, his tunnel vision focus on his speedy trial claim, his pursuit of motions and defenses that were unsupported by the law and evidence, his ineffective questioning of witnesses, and his failure to comply with the rules of criminal procedure—none of these demonstrate that defendant lacked any mental ability to make a meaningful decision to represent himself or to understand the ramifications of such a decision. They simply reflect the lack of legal acumen that would be expected of any person who had not attended law school or practiced law as a profession.

¶ 110    Defendant's arguments on appeal implicitly recognize that his shortcomings in his self-representation relate to lack of legal knowledge and skill, not his mental ability to competently choose to represent himself. For example, in his reply brief, defendant points out that if an attorney failed to thoroughly review all discovery, that attorney would be considered ineffective. In addition, defendant argues in his reply brief that the trial court should have precluded him from representing himself because he was unable to present a "meaningful" defense. Both of these arguments speak to and measure the legal quality or success of a defense; they say nothing about a defendant's mental faculties or ability to make a knowing choice to represent oneself. Just because a *pro se* defendant is incapable of presenting a successful defense or defending himself as effectively as a trained and licensed attorney would, that does not mean that he is so mentally

deficient as to be unable to make a knowing and intelligent decision to defend himself. After all, as previously discussed, the standard for assessing the validity of a criminal defendant's waiver of counsel is whether it is knowing, voluntary, and intelligent, not whether he can defend a case with the same legal acumen as a practicing attorney. Moreover, even licensed attorneys often make poor strategic choices, file baseless motions, and fail to follow procedural rules and trial court instructions with surprising regularity.

¶ 111     For all the reasons we previously discussed, we conclude that the trial court did not err in failing to *sua sponte* order a hearing on defendant's continued competency to waive counsel.

¶ 112                                    CONCLUSION

¶ 113     For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

¶ 114     Affirmed.

---

**No. 1-17-3030**

---

| | |
|---|---|
| **Cite as:** | *People v. McNutt*, 2020 IL App (1st) 173030 |

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 17-CR-8953; the Hon. Ursula Walowski, Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | James E. Chadd, Patricia Mysza, Manuel S. Serritos, and Sean Collins-Stapleton, of State Appellate Defender's Office, of Chicago, for appellant. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, Jon Walters, and Emily Stevens, Assistant State's Attorneys, of counsel), for the People. |

---