2022 IL App (1st) 192051-U

SECOND DIVISION
September 27, 2022

No. 1-19-2051

NOTICE: This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | |
| | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| | ) | Cook County. |
| v. | ) | |
| | ) | No. 14 CR 19075 |
| LEONDO JOSEPH, | ) | |
| | ) | Honorable |
| Defendant-Appellant. | ) | Dennis J. Porter, |
| | ) | Judge Presiding. |
| | ) | |

PRESIDING JUSTICE FITZGERALD SMITH delivered the judgment of the court. Justices Howse and Ellis concurred in the judgment.

**O R D E R**

¶ 1    *Held*: It was not plain error for the circuit court to permit the defendant to represent himself at trial without first *sua sponte* determining if he had the mental capacity to represent himself, where the defendant was twice found fit to stand trial and twice knowingly and voluntarily waived his right to counsel. It was not plain error for the circuit court to sentence the defendant to 35 years' imprisonment on each aggravated criminal sexual assault conviction. In imposing the sentences, the court did not consider any improper aggravating factors. The sentences were within the statutorily prescribed range and therefore presumptively valid.

¶ 2    After a jury trial in the circuit court of Cook County, the defendant, Leondo Joseph, was convicted of three counts of aggravated criminal sexual assault (720 ILCS 5/12-14(a)(2) (West 2010)) and sentenced to three consecutive terms of 35 years' imprisonment. On appeal, the defendant contends that the circuit court abused its discretion when: (1) it failed to *sua sponte* conduct a hearing to determine whether he had the mental capacity to represent himself at trial pursuant to *Indiana v. Edwards*, 554 U.S. 64, 178 (2008); and (2) it relied on an improper aggravating factor when sentencing him to an aggregate of 105 years' imprisonment. For the following reasons, we affirm.

¶ 3                                I. BACKGROUND

¶ 4    Because the record before us is voluminous, we set forth only those facts and procedural history relevant to the resolution of the issues in this appeal. In November 2014, the defendant was appointed counsel and arraigned in six separate cases (Nos. 14 CR 19073, 14 CR 19074, 14 CR 19075, 14 CR 19076, 14 CR 19077, and 14 CR 19078) alleging various counts of aggravated criminal sexual assault against numerous victims. The defendant's brother, L.B. Joseph, was named as a codefendant in two of those cases (Nos. 14 CR 19077 and 14 CR 19078). The present appeal concerns only case No. 14 CR 10975, wherein the defendant was charged by indictment with 15 counts of aggravated criminal sexual assault (720 ILCS 5/12-14(a)(2), (4)[1] (West 2010)) and 5 counts of aggravated criminal sexual abuse (720 ILCS 5/12-16(a)(2), (4), (6) (West 2010)) against the victim, A.B.

¶ 5    On January 8, 2015, the circuit court granted defense counsel's request for a Behavioral Clinical Examination (BCX) to examine, *inter alia*, the defendant's fitness to stand trial and his sanity. The report was completed on January 26, 2015, by licensed clinical psychologist Susan

---

[1] We note that in 2011, pursuant to P.A. 96-1551, this section of the statute was renumbered to 720 ILCS 5/11-1.30.

Messina of Forensic Clinical Services (FCS) and found that the defendant was fit to stand trial and legally sane at the time of the alleged offense.

¶ 6    On February 24, 2015, defense counsel acknowledged receipt of the BCX report. The defendant then informed the court that he wished to be appointed a different public defender because his current one was "not helping him." After questioning defense counsel, the circuit court denied the defendant's request. Thereupon, the defendant's brother, who was in court as the codefendant, stated that what the defendant wanted was to represent himself. The defendant confirmed that this was true. The court then set a hearing date to properly admonish the defendant but warned him to "think long and hard about what you're doing." As the court cautioned: "I don't think it's a good idea. The saying is the lawyer who represents himself has [a] fool for a client. [W]hat do you think *** that guy would say about a non[-]lawyer who represents himself? You can think about that."

¶ 7    At the next hearing on March 6, 2015, the defendant reiterated that he wished to proceed *pro se*. The circuit court then admonished the defendant pursuant to Illinois Supreme Court Rule 401(a) (eff. July 1, 1984). The defendant acknowledged: (1) that he understood the charges against him; (2) that any sentences imposed on criminal sexual assault convictions would be served consecutively; and (3) that he had a right to hire counsel of his choice, to have counsel appointed if he could not afford or hire one, or to represent himself.

¶ 8    The court then questioned the defendant about his educational background and experience with the legal system. The defendant indicated that he had not previously represented himself in any civil or criminal proceeding but stated that he had completed high school and "some college."

¶ 9    The circuit court next admonished the defendant regarding the perils of self-representation, including, *inter alia*, that: (1) he would be required to follow the rules of evidence; (2) he would

not be given extra time in the law library; (3) his unfamiliarity with the trial procedures would give the State an advantage; (4) he could end up making unintended tactical mistakes; (5) the effectiveness of his defense could be diminished by his dual role as attorney and accused; (6) if allowed to proceed *pro se* he would not be allowed to change his mind during trial; (6) it was unlikely that standby counsel would be appointed; and (7) he would not be permitted to complain on appeal about the competency of his self-representation. After the defendant indicated that he understood the risks, the court permitted defense counsel to withdraw and the defendant to proceed *pro se*.

¶ 10    For the next several months, the defendant actively participated in the pretrial litigation of all six of his cases. Among other things, he received and signed receipts for redacted discovery, objected to the State's DNA evidence consumption notice in one of the cases, and filed at least ten different motions.[2] Relevant to this appeal, on May 28, 2015, the defendant filed a motion requesting that a new BCX on fitness and sanity be performed. The court granted the defendant's motion and ordered a new BCX, noting that the February mental examination was "stale."

¶ 11    The new BCX was completed on June 12, 2015, by FCS licensed clinical psychologist Brian Curran. The report found that the defendant was "currently fit to stand trial," and that he was legally sane at the time of the alleged offense.

¶ 12    According to the report, the defendant was compliant with the evaluation and appropriately responded to questions. He displayed adequate hygiene and grooming and remained seated but avoided eye contact. The defendant was "alert and oriented in all spheres," and his "thought process was sequential and goal-oriented." His short-term memory and concentration appeared to be intact. His responses were "logical and linear" and there was no indication that he was confused

---

[2] While most of these motions are not part of the common-law record, the report of the proceedings shows that they were filed, argued by the parties, and ruled upon by the court.

or misunderstood any of the questions.

¶ 13    In addition, the defendant displayed a "contextually appropriate range of emotions with constricted affect." He did not endorse or display significant symptoms of anxiety, depression, or mania, nor appeared to be "responding to internal stimuli." He was not currently prescribed psychotropic medication, and there was no evidence of "bizarre or delusional thinking, significant cognitive dysfunction or disordered thought process."

¶ 14    The report concluded that the defendant correctly understood: (1) the nature and seriousness of the charges against him; (2) the roles of the public defender, prosecutor, judge, witnesses, and evidence; (3) the difference between a bench and jury trial; and (4) the meaning of a plea bargain. In addition, the defendant "made logical and detailed comments about possible sentencing options." The defendant also understood that he could not be compelled to testify and that a witness could be charged with a crime for giving false testimony.

¶ 15    On June 25, 2015, the circuit court tendered the BCX to the defendant telling him: "[i]t says you're fit, legally sane, and able to understand *Miranda*." The court then added:

> "I have never had any doubt that you were fit. I never saw any indication that you were not. So[,] I personally don't think there's a need for a hearing, although if you want a hearing, we can do a hearing. You want a hearing?"

The defendant replied: "It don't matter. No."

¶ 16    For the next fifteen months, the defendant continued to represent himself in the pretrial proceedings in all six cases. Among other things, the defendant received additional discovery, requested criminal background checks on the victims in several of the cases, and issued a subpoena to the Independent Police Review Authority (IPRA) for records regarding Chicago Police Detective Mark DiMeo, who was one of the police officers involved in his arrest. The circuit court

subsequently reviewed the subpoenaed IPRA records and determined that they were irrelevant and would be inadmissible at trial. The defendant also filed numerous motions, including a motion for a change of venue, a motion for the removal of certain counts in his indictments, and a motion requesting that he be placed on electronic monitoring. In addition, the defendant twice requested and was denied the appointment of standby counsel.

¶ 17    On July 14, 2016, the court heard and denied the defendant's motion to dismiss the instant case on the basis that his arrest violated the fourth amendment.

¶ 18    In September 2016, the State elected to proceed on case No. 14 CR 19077. The defendant and his brother, who was the codefendant, were tried jointly, each representing himself. After a jury trial, the defendant was found guilty of six counts of aggravated criminal sexual assault with a firearm (720 ILCS 5/12-14 (West 2010)), one count of aggravated kidnapping with a firearm (720 ILCS 5/10-2(a)(6) (West 2010)), and one count of aggravated battery on a public way (720 ILCS 5/12-4 (West 2010)). On October 18, 2016, the defendant requested and was granted the appointment of counsel for the sentencing and posttrial hearings in that case. The court subsequently sentenced the defendant to 147 years' imprisonment, the minimum sentence allowed by the confluence of consecutive-sentencing provisions and the 15-year firearm enhancements that applied to the aggravated kidnapping and six aggravated criminal sexual assault convictions.

¶ 19    On June 30, 2017, the defendant indicated to the court that he wished to proceed *pro se*. The court once again admonished the defendant pursuant to Illinois Supreme Court Rule 401(a) (eff. July 1, 1984). Specifically, the court detailed the minimum and maximum sentences that the defendant faced on the offenses in all six cases, including that he faced an extended term of 30 to 60 years' imprisonment on the aggravated criminal sexual assault charges in the instant case (No. 14 CR 19075). The defendant was again advised and acknowledged that he would have to abide

by the procedural rules of the court, that he was entitled to an attorney and that he would be given no special treatment or extra time for preparation. In addition, when the court instructed the defendant that it saw no reason for the appointment of standby counsel and reminded the defendant that he would be "sitting there by [him]self," the defendant confirmed that he understood and wished to proceed *pro se*. The court then once again permitted the defendant to represent himself.

¶ 20    On July 14, 2017, the State elected to proceed on the instant case. The defendant filed motions to dismiss the search warrant and to quash his arrest. On August 29, 2018, the court held a hearing on the two motions.

¶ 21    During the hearing, the defendant called and questioned three Chicago police officers. Detective DiMeo testified that on September 24, 2014, he received information from the Illinois State Police (ISP) forensic center that DNA generated in case No. 14 CR 19078, involving the victim, D.C., matched other unsolved sexual assaults. Detective DiMeo was aware that in September 2012, the defendant and his brother had been arrested but released in relation to that case. After receiving the new DNA information, however, on September 24, 2012, the detective showed D.C. a photo array from which she identified the defendant as the man who assaulted her. Thereafter, failing to locate the defendant at his known address at 2573 North Halsted Street, Detective DiMeo issued an investigative alert indicating that there was probable cause for his arrest.

¶ 22    Officers Lewis Norvalez and Anthony Odeshoo next testified that based upon this investigative alert on September 15, 2014, at about 7:30 p.m., they proceeded to the Halsted address with a photograph of the defendant. Once there, Officer Norvalez saw the defendant exist the elevator in the lobby of the building and called his name. When the defendant turned around, the officer announced his office and told the defendant that there was an alert with probable cause

for his arrest, after which he detained and subsequently arrested the defendant. After the arrest, a buccal swab was obtained from the defendant that matched the DNA profile in the instant case.

¶ 23    After hearing this evidence, the court denied the defendant's motion to quash arrest. The court, however, granted the defendant's motion to quash the search warrant used to take the defendant's buccal swab post-arrest but ruled that the DNA results from that swab would be admissible under the inevitable discovery rule.

¶ 24    On September 19, 2018, among other things, the State filed its long answer to discovery. The court then heard and denied the defendant's motion to dismiss the charges based on a due process violation. After noting that discovery was complete the court next asked the defendant whether he wanted to proceed with a bench or jury trial so that a trial date could be set. The defendant responded that he wanted a continuance because he did not want to go to trial *pro se* and instead wanted a *pro bono* lawyer. The court denied the defendant's request for a continuance and set the trial for November 2, 2018. When the defendant continued to protest, the court observed, "I have to tell you *** I get the feeling that you don't want to go to trial ever."

¶ 25    At the next status hearing, on October 23, 2018, the defendant reiterated that he did not want to proceed to trial without a *pro bono* lawyer but refused the court's offer to appoint the public defender to represent him.

¶ 26    On November 2, 2018, the State indicated that it was not ready to proceed with trial because of witness unavailability and asked the court for a new trial date. The defendant then insisted that he would not go to trial without a *pro bono* lawyer. When the court offered to reappoint the public defender to represent the defendant, the defendant again refused, threatening the court with the judicial inquiry board.

¶ 27    On February 4, 2019, the defendant again reiterated that he did not want to go to trial

without a *pro bono* lawyer and that he would not be forced to go to trial like he had been in case No. 14 CR 19077. The defendant asserted that he was not ready for trial because he was denied adequate access to the law library and his "law work" had been "lost," by which he referred to two general progress reports, which the court had previously determined were misplaced and could not be found. Once again, the defendant warned the judge that he would be going to the "inquiry board" and would seek "appellate review." The court again asked the defendant whether he wanted to be appointed the public defender to represent him, and the defendant vehemently indicated that he did not, and that instead he wanted a *pro bono* lawyer. At this point, the court made a "finding that the defendant [wa]s exercising this as a delay tactic." The defendant responded that he was not trying to delay the trial but was being "railroaded." He added that if the court made him go to trial, he would "go naked, and go on strike," and talk about the Super Bowl.

¶ 28 The court then informed the defendant that it would hold a recess for lunch after which the jury venire would be brought up and the trial would commence. The defendant responded, "I don't care. I don't care. We will sit and look at each other." He then refused to accept the State's witness list and proposed jury instructions.

¶ 29 After the jury venire was sworn and excused for lunch, the court explained the process by which the jury would be selected. As the court did so, the defendant interjected comments, including: "I don't give a f*** what you do. Do what the f*** you want;" "I don't give a f*** what's happening;" "[Y]eah, yeah, yeah, yeah;" and "Bitch."

¶ 30 Subsequently, the defendant mostly remained silent and uninvolved during the remainder of his trial. Specifically, he refused to: (1) meaningfully participate in the *voir dire* or the jury selection conference; (2) make an opening or closing argument; (3) cross-examine ten of the State's elven witnesses; (4) speak when asked if he wanted to present any evidence; and (5) make

any comments during the jury instruction conference. The defendant solely interposed objections during Detective DiMeo's testimony, claiming that the detective was perjuring himself. In addition, as shall be detailed more fully below, he elected to cross-examine only one witness, Assistant State's Attorney [ASA] Ronald Kline.

¶ 31     According to the record, the evidence adduced at the defendant's trial established that on May 23, 2010, the victim, A.B. who was 26-years old, shared a two-bedroom garden apartment with a roommate on West George Street in Chicago. Sometime between 3 and 4 a.m., A.B. and a couple of her friends returned to her apartment after an evening out and spent about an hour eating and listened to music.

¶ 32     After her friends left, A.B. changed into her pajamas and turned off the lights. As she was getting into bed, she heard a noise. Turning around, she saw a male figure standing in her bedroom doorway dressed all in black, with a ski mask and gloves. The man rushed towards her, grabbing her arms just above the wrists. A.B. screamed and struggled to break free, kicking the man, but he overpowered her. The assailant pushed her back on the bed, pinned her down on her back with his weight, and put his hand over her mouth. Holding her wrists with her arms above her head with one hand, he then raised a "heavy statuette" over her head with the other and told her that if she "didn't stop screaming he was going to bash [her] brains in." The assailant then pulled off A.B.'s pajama pants and underwear and placed his unerect penis against her vagina and then her anus. He subsequently placed his erect penis into her vagina and ejaculated. After the assault, he brought A.B. a cold bottle of water and tied her ankles "loosely," before leaving her apartment.

¶ 33     A.B. untied herself, covered herself with a blanket and left the apartment by the back door. After unsuccessfully banging on her upstairs neighbor's door, she exited the building and flagged

10

down a cab. The cabbie called the police and an ambulance arrived to take A.B. to the hospital.

¶ 34    Once there, A.B. underwent a full sexual assault exam, including a "rape kit," during which swabs were taken from her vagina and anus and other parts of her body (including her mouth, fingernails, cheeks, and breasts) and placed in sealed bags to be taken to the ISP crime lab.

¶ 35    A police officer at the hospital took photographs of A.B.'s injuries. These were introduced as exhibits at trial and depicted, among other things: cuts and bruises to A.B.'s face; a swollen lip; welts and lines on her neck; scratches on her breasts; bruises on her arms, shoulders, knees, and thigh; and a laceration on the right side of her head.

¶ 36    The testimony of the State's DNA analysis experts established that the vaginal and anal swabs taken from A.B. tested positive for semen. It was further determined that the DNA in the semen of both samples belonged to the same person. Because at that time no male DNA was available for comparison, the profile was entered into a DNA database. In late 2013 or early 2014, a DNA association with the DNA profile in A.B.'s case was identified.

¶ 37    On September 23, 2014, Detective DiMeo learned that a DNA association had been made implicating the defendant as A.B.'s attacker. Unable to locate the defendant, the detective issued an investigative alert. After that alert resulted in the defendant's arrest, a buccal swab was collected from the defendant for purposes of obtaining his DNA. The profile in A.B.'s case was then compared to the DNA profile obtained from the defendant's buccal swab and revealed a match.

¶ 38    On September 26, 2014, the defendant made a statement to ASA Robert Kline in the presence of Detective DiMeo. That statement was reduced to writing and signed by the defendant. ASA Kline read the statement to the jury.

¶ 39    According to the statement, the defendant admitted, *inter alia*, that he entered A.B.'s apartment through an open window while she was out. Three women arrived and he hid in the

closet while they talked. Once two of the women left, he walked towards the bedroom, where A.B. was looking at her cell phone. When A.B. saw the defendant, she asked him why he was there, and they tussled and wrestled until she hit him with a lamp. The defendant then grabbed A.B. from behind and held her, at which point she took her pajama bottoms off and said "Fuck it. Just get it over with."

¶ 40 In his statement, the defendant further admitted that he got on top of A.B., penetrated her vagina and ejaculated. He also admitted that he held A.B.'s hands above her head while he had sex with her so that she could not hit him with anything. After he was done, the defendant got A.B. water, tied her up with belts, and left.

¶ 41 On cross-examination, the defendant attempted to solicit information from ASA Kline about how he was treated by the police prior to making his statement. ASA Kline denied that Detective DiMeo refused to leave the interview room while ASA Kline questioned the defendant about his treatment. In addition, ASA Kline maintained that the defendant had told him that he "had been treated excellent" by the police.

¶ 42 The evidence presented at trial further established that after the defendant gave his statement to police, on September 17, 2014, A.B. was shown two six-person photo arrays of possible assailants but could not identify her attacker. She signed a statement attesting that she did not recognize or know her attacker and that she never had consensual sex with any of the individuals in the photo arrays.

¶ 43 Based on the aforementioned evidence, the jury found the defendant guilty of three counts of aggravated criminal sexual assault.

¶ 44 On March 13, 2019, the court granted the defendant's request for the appointment of a public defender. Defense counsel subsequently filed a motion for a new trial, which was denied

by the circuit court.

¶ 45    On August 27, 2019, the parties proceeded with sentencing. The State corrected the defendant's presentence investigation report (PSI) to reflect that the defendant's only felony convictions were in case No. 14 CR 19077. The State noted, however, that the following five cases, all alleging criminal sexual assault, were still pending against the defendant: 14 CR 19073, 14 CR 19074, 14 CR 19076, 14 CR 19078, and 16 CR 16846. The PSI also noted that the defendant had pleaded guilty to an assault charge in 2008, and to a public indecency charge involving a sex act and trespass to land in 2007. In addition, the defendant received supervision on a public indecency/lewd exposure charge in 2006.

¶ 46    After A.B.'s victim impact statement was read to the court, the parties proceeded with arguments. The State pointed out that the defendant was extended-term eligible and urged for the imposition of a high sentence based on the lack of any mitigating circumstances, the defendant's prior criminal history, and the serious harm he had caused the victim. On the other hand, defense counsel argued that the court should impose a reasonable sentence based on the PSI.

¶ 47    The defendant then spoke in allocution, claiming that he had no prior criminal history aside from the instant case and that the victim in case No. 14 CR 19077, wherein he had been convicted with six counts of aggravated criminal sexual assault, was a prostitute who had lied about soliciting him and had committed "burglary 30 times."

¶ 48    The court sentenced the defendant to three consecutive terms of 35 years' imprisonment and ordered that these sentences be served consecutively to those imposed for the convictions in case No. 14 CR 19077. In doing so, the court noted that the primary aggravating factor was the defendant's "extensive" prior criminal record, and that the defendant could be fairly characterized as "a serial rapist." In mitigation, the court acknowledged that the defendant had a good

relationship with his mother, some job history, and that he had reported in the PSI that he had been diagnosed with bipolar disorder and schizophrenia while in prison. The court, nonetheless, found that the defendant displayed no remorse for his crimes, insisted upon disparaging his prior victims to excuse his own behavior, and was a danger to society, particularly women. The court concluded that "the chances of [the defendant] being rehabilitated to be just about zero."

¶ 49    On September 13, 2019, the court denied the defendant's motion to reconsider his sentence. The defendant now appeals.

¶ 50                                   II. ANALYSIS

¶ 51              A. The Defendant's Mental Capacity for Self-Representation

¶ 52    On appeal, the defendant first contends that the circuit court abused its discretion when it failed to *sua sponte* hold a hearing to determine whether he was mentally competent to represent himself at trial pursuant to *Edwards*, 554 U.S. 64, 178 (2008). The State initially argues, and the defendant concedes, that he failed to preserve this issue for appeal. The defendant nonetheless asks this court to review his claim under the second prong of the plain error doctrine. Ill. S. Ct. R. 615(a) (eff. Jan.1, 1967); *People v. Herron,* 215 Ill. 2d 167, 186-87 (2005).

¶ 53    It is axiomatic that to preserve a claim for appeal a defendant must both: (1) object to the error at trial; and (2) raise the error in a posttrial motion. See *People v. Sebby*, 2017 IL 119445, ¶ 48; see also *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). "Failure to do either, results in forfeiture." *Sebby*, 2017 IL 119445, ¶ 48.

¶ 54    The plain error doctrine, however, bypasses normal forfeiture principles and allows a reviewing court to consider unpreserved claims of error under two limited circumstances: (1) when a clear or obvious error occurred and the evidence is so closely balanced that this error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the

error; or (2) when a clear or obvious error occurred that affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence. *People v. Bowman,* 2012 IL App (1st) 102010, ¶ 29 (citing *Herron,* 215 Ill. 2d at 177). *Id.*; see also *People v. Piatkowski,* 225 Ill. 2d 551, 565 (2007); see also Ill. S. Ct. R. 615(a) (eff. Jan.1, 1967) ("Any error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded. Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the trial court"). The defendant bears the burden of persuasion under either prong. See *Sebby*, 2017 IL 119445, ¶ 51.

¶ 55    Because both the right to be fit for trial and the right to counsel are "fundamental" rights, the question of whether the circuit court had a *sua sponte* obligation to assess the defendant's fitness to represent himself at trial may be reviewed for plain error under the second prong. *People v. Khan*, 2021 IL App (1st) 190679, ¶ 56 (citing *People v. Sandham*, 174 Ill. 2d 379, 382 (1996)); see also *People v. Herring*, 327 Ill. App. 3d 259, 261 (2002).

¶ 56    The first step under either prong of the plain-error doctrine, however, is to determine whether there was an error at trial and whether this error was clear or obvious. *Sebby*, 2017 IL 119445, ¶ 49; see also *Piatkowski*, 225 Ill. 2d at 565. Accordingly, we first address whether the circuit court erred when it failed to *sua sponte* inquire into the defendant's mental capacity to represent himself at trial.

¶ 57    The sixth amendment of the United States constitution (U.S. Const., amend VI) guarantees criminal defendants both the right to the assistance of counsel and the right to proceed *pro se*. See *Faretta v. California*, 422 U.S. 806 (1975); see also *People v. Haynes*, 174 Ill. 2d 204, 235 (1996) see also *People v. Washington*, 2017 IL App (4th) 150054, ¶ 17 (quoting *United States v. Purnett*, 910 F.2d 51, 54 (2d Cir. 1990) (" 'The right to self-representation and the assistance of counsel

15

are separate rights depicted on the opposite sides of the same Sixth Amendment coin. To choose one obviously means to forego the other.' " ). The right to self-representation is just as fundamental as the right to the assistance of counsel. *People v. McNutt*, 2020 IL App (1st) 173030, ¶ 78. Even where a defendant's decision to proceed *pro se* might be unwise, it must be honored "out of respect for the individual." *Id.* To effectively waive counsel and represent himself at trial a criminal defendant must knowingly and voluntarily waive his right to counsel. *Id.*

¶ 58    To be able to waive his right to counsel, however, a defendant must first be fit to stand trial. *People v. Washington*, 2016 IL App (1st) 131198, ¶ 70 ("Due process bars the prosecution of an unfit defendant."). "Fitness speaks only to a person's ability to function within the context of trial; it does not refer to sanity or competence in other areas." *Khan*, 2021 IL App (1st) 190679, ¶ 58 (quoting *People v. Coleman,* 168 Ill. 2d 509, 524 (1995)). A person may be fit for trial although his mind is otherwise unsound. *Khan*, 2021 IL App (1st) 190679, ¶ 58. Factors considered in determining fitness include, but are not limited to, a defendant's irrational behavior, his demeaner at trial, and any prior medical opinion on the defendant's competence. *People v. Harris*, 206 Ill. 2d 293, 304 (2002). While a defendant is generally presumed to be fit, "the circuit court has a duty to order a fitness hearing, *sua sponte*, any time a *bona fide* doubt arises regarding a defendant's ability to understand the nature and purpose of the proceedings or assist in his defense." *Sandham*, 174 Ill. 2d at 382. A defendant who is fit to stand trial, and who knowingly and voluntarily waives his right to counsel and elects to proceed *pro se*, even if mentally ill, receives a fair trial that comports with due process. *Godinez v. Moran*, 509 U.S. 389, 400-402 (1994).

¶ 59    Whether a *bona fide* doubt as to the defendant's fitness has arisen is generally a matter within the discretion of the circuit court. *Sandham*, 174 Ill. 2d at 382. Similarly, a circuit court's

determination that a defendant effectively waived his right to counsel is reviewed for an abuse of discretion. *McNutt*, 2020 IL App (1st) 173030, ¶ 85. An abuse of discretion occurs only "where the [circuit] court's ruling is arbitrary, fanciful, unreasonable, or where no reasonable person would take the view adopted by the trial court." (Internal quotation marks omitted.) *People v. Baez*, 214 Ill. 2d 44, 106 (2011).

¶ 60    In the present case, the defendant contends that the circuit court abused its discretion when it failed to conduct a *sua sponte* hearing to determine whether he had the mental capacity to represent himself at trial. In making this argument, the defendant concedes that there was no *bona fide* doubt as to his general fitness but contends that his increasingly erratic behavior and irrational thinking in the months preceding his trial put the circuit court on notice that there was a concern about his ability to represent himself, requiring the court to hold a *sua sponte* hearing to determine his mental capacity. In support, the defendant relies on the United States Supreme Court decision in *Edwards*, 554 U.S. 64, 178 (2008). For the following reasons, we disagree and find that case inapposite.

¶ 61    In *Edwards*, the Supreme Court considered whether there was "a mental-illness-related limitation on the scope" of the right of self-representation. *Edwards*, 445 U.S. at 171. The Court concluded that the right to self-representation was not absolute and that the so-called "gray area" defendant, *i.e.*, one who was otherwise fit to stand trial but due to "severe mental illness" lacked the mental capacity to represent himself, could be forced to accept representation. *Edwards*, 554 U.S. at 173-74, 178. In doing so, the Court reasoned that an individual may well be able to satisfy the mental competence standard to stand trial when represented by counsel yet may be unable to carry out the basic tasks needed to present his own defense without the help of an attorney. *Edwards*, 544 U.S. at 175-76. The Court also noted that " 'mental illnesses can impair the

defendant's ability to play the significantly expanded role required for self-representation even if he can play the lesser role of the represented defendant. [Citation].' " *Id*. at 176. The Court additionally noted that the right of self-representation at trial would not affirm the dignity of a defendant who lacks the mental capacity to conduct his defense without the assistance of counsel. *Id*. As the Court concluded:

> "[T]he Constitution permits judges to take a realistic account of the particular defendant's mental capacities by asking whether a defendant who seeks to conduct his own defense at trial is mentally competent to do so. That is to say, the Constitution permits States to insist upon representation by counsel for those competent enough to stand trial *** but who still suffer from severe mental illness to the point where they are not competent to conduct trial proceedings by themselves." *Id*. at 178.

¶ 62    Citing to *Edwards* the defendant contends that he is the "gray area" defendant and that the court therefore had an independent duty to assess his mental capacity in the months prior to his trial by *sua sponte* conducting a hearing to determine his competence to represent himself.

¶ 63    The defendant, however, fails to recognize that *Edwards* did not direct the trial courts to do anything. Instead, it merely provided that a court does not violate the Constitution if it does appoint counsel for a "gray-area" defendant who instead wishes to represent himself. The *Edwards* decision nowhere suggested that trial courts have an independent duty to conduct a *sua sponte* hearing to determine a defendant's competency prior to trial. In fact, we have repeatedly held that *Edwards* neither creates a higher standard of competence, nor requires any additional inquiry, before a trial court may allow a "gray-area" defendant to represent himself. See *People v. Rodriguez-Aranda*, 2022 IL App (3d) 200715, ¶ 50 ("*Edwards* is permissive rather than prescriptive: the trial court may deny a severely mentally ill person from representing himself,

however, the trial court is not required to perform an additional inquiry regarding competency before allowing a defendant to represent himself."); *People v. Tatum*, 389 Ill. App. 3d 656, 670 (2009) (*Edwards* does not impose "a higher standard of competence requiring an additional inquiry before a trial court [may] permit[] a defendant to proceed *pro se*"); see also *McNutt*, 2020 IL App (1st) 173030, ¶¶ 90, 92 (*Edwards* does not "require[] a higher or different standard of competency be applied to every defendant before he or she is permitted to waive counsel"; Nor does it require a court "to conduct a separate hearing to assess [a] defendant's competency to waive counsel."); *Khan*, 2021 IL App (1st) 190679, ¶ 62 (same); see also *People v. Allen*, 401 Ill. App. 3d 840, 852 (2010) ("[n]othing in *Edwards requires* a trial court to [engage in] the forced denial by the trial court of [the] defendant's right to proceed *pro se* although he was found mentally competent to stand trial." (Emphasis added.)). Accordingly, once the circuit court determined that the defendant was fit to stand trial and that he knowingly and voluntarily waived his right to counsel, it was not required to conduct any additional inquiry before permitting the defendant to proceed *pro se*.

¶ 64    In the present case, the defendant concedes that he was twice found fit to stand trial and that there is no *bona fide* doubt as to his general fitness. Moreover, in permitting the defendant to waive his right to counsel, the circuit court properly inquired into the defendant's age, education, and legal experience, twice admonished him pursuant to Supreme Court Rule 401(a) (eff. July 1, 1984) and thoroughly advised him of the potential dangers of representing himself. The defendant does not explain why this inquiry was procedurally deficit, what else the circuit court was required to do or how this further inquiry would have altered the defendant's waiver of his right to counsel. Accordingly, because the defendant does not dispute that he was fit to stand trial and *Edwards* does not impose a higher standard for permitting him to proceed *pro se* nor required the circuit court to further inquire into his mental capacity for self-representation, the defendant cannot show

that the circuit court committed any error. See *McNutt,* 2020 IL App (1st) 173030, ¶ 92 (holding that the defendant could not establish that the trial court abused its discretion in finding that he was competent to waive counsel and represent himself where the court admonished him pursuant to the requisite supreme court rules and inquired into his educational and legal experience and the defendant did not explain why such inquiries were insufficient).

¶ 65    What is more, in relying on *Edwards*, the defendant fails to acknowledge that in permitting trial courts to impose representation on a very narrow category of defendants, the United States Supreme Court expressly held that such an imposition was permitted only for those defendants that are "competent enough to stand trial but *who still suffer from severe mental illness* to the point where they are not competent to conduct trial proceedings by themselves." *Edwards*, 544 U.S. at 178. Therefore, by its own terms *Edwards* "applies only to those cases where [a] defendant exhibit[s] 'severe mental illness' that would impact his ability to represent himself at trial." *McNutt*, 2020 IL App (1st) 173030, ¶ 91.

¶ 66    Contrary to the defendant's position, the record here is devoid of any evidence of such "severe mental illness." On appeal, the defendant himself nowhere contends that he was mentally ill, severely, or otherwise. Nor, as already noted above, does he argue that he was unfit to stand trial. In fact, he concedes that there was no *bona fide* question as to his general fitness. The defendant's sole argument on appeal is that the "erratic and irrational" behavior in the months preceding his trial should have put the court on notice that he was not competent to represent himself. In this respect, the defendant maintains that in the months immediately preceding his trial, he displayed "disorganized thinking and impaired focus on the case" by continuing to request: the criminal background of the victim in case No. 14 CR 19077 after he had already been convicted and sentenced in that case; Detective DiMeo's IPRA file, which the circuit court had previously

determined was irrelevant; and two general progress reports even after it was determined that they were lost and could not be found. For the following reasons, we disagree and find that the circuit court had no reason whatsoever to question the defendant's mental competency to represent himself in the months leading up to his trial.

¶ 67 The record below reveals that beginning with the defendant's arraignment in 2014, the same trial judge presided over the defendant's proceedings through the instant trial in 2016. The same trial judge also presided over the defendant's 2016 trial in case No. 14 CR 19077, in which the defendant represented himself. The trial judge therefore had the opportunity to observe and assess the defendant's behavior for more than five years and was in the best position to make a "more fine-tuned mental capacity decision[], tailored to [the defendant's] individualized circumstances." *Edwards*, 554 U.S. at 177.

¶ 68 As already noted above, during those five years, the defendant was twice evaluated for his mental fitness. The first BCX was requested by his public defender and the second was conducted upon the defendant's own *pro se* motion. The exams were conducted by two separate evaluators who both independently found the defendant fit to stand trial. Neither evaluator noted any mental illness in the defendant's background or any inability by him to understand or participate in the trial proceedings. Following the second BCX, the trial judge agreed with the evaluator and told the defendant: "I have never had any doubt that you were fit," and "never saw any indication that you were not."

¶ 69 The record below further reveals that for five years the defendant actively litigated all six of his criminal sexual assault cases. Among other things, the defendant signed for and reviewed the discovery tendered to him and made successful requests for discovery and the issuance of subpoenas. He also filed and argued numerous motions covering a range of issues, including

requests for standby counsel, release on home monitoring, and a change of venue based on potentially prejudicial media coverage of his case.

¶ 70    With respect to the instant case, the defendant filed motions for dismissal twice, based on an alleged due process violation and on fourth amendment grounds. The defendant also attacked his search warrant on the basis that the police lacked probable cause and challenged his warrantless arrest. He litigated these motions at an evidentiary hearing, where he made opening and closing statements and examined three police officers. The court granted his motion challenging the search warrant, concluding that it had merit but found that the evidence obtained was admissible under the inevitable discovery rule.

¶ 71    Prior to the instant trial, the defendant also represented himself at a jury trial in case No. 14 CR 19077, where he cross-examined the State's witnesses and gave a closing argument.

¶ 72    Throughout these proceedings the defendant appeared coherent and was able to articulate his arguments in written motions and orally before the circuit court. Because the same trial judge presided over the entirety of these five-year-long proceedings, he had the best opportunity to observe the defendant's behavior and determine whether he had the mental capacity to represent himself. Where the trial judge found no reason to question the defendant's competency, we, as the reviewing court, may not substitute our judgment for that of the trial court. See *Allen* 401 Ill. App. 3d at 852 (holding that an appellate court should not substitute its judgment for that of the trial court on the question of whether the defendant is mentally competent to represent himself, and finding no error in the trial court's determination to allow the defendant to proceed *pro se* where the defendant had been found fit to stand trial and where the court had an opportunity to observe his behavior firsthand); see also *Edwards*, 554 U.S. at 177 (In determining a criminal defendant's mental capacity for self-representation the trial court is "best able to make more fine-tuned mental

capacity decisions, tailored to [the defendant's] individualized circumstances").

¶ 73    In coming to this conclusion, we reject the defendant's contention that his repeated requests for the criminal background of the victim in case No. 14 CR 19077, the detective's IPRA file, and two general progress reports in the months leading up to the instant trial, reflect his inability to represent himself. At best, we find that this behavior shows the defendant's lack of sophistication, knowledge, and experience in understanding the discovery process. See *McNutt*, 2020 IL App (1st) 173030, ¶¶ 94-96 (holding that a defendant's poor tactical decisions and behavior evidenced his lack of knowledge, experience, and training, rather than any detachment from reality, inability to communicate, and represent himself at trial); see also *People v. Redd*, 173 Ill. 2d 1, 24 (1996) (holding that the defendant's numerous rambling motions showed a lack of comprehensive knowledge of the law and principles of criminal procedure but were not indicative of his competence); *Tatum*, 389 Ill. App. 3d at 670-71 (concluding that the defendant's numerous interruptions and his theory that everyone was trying to frame him did not render him incapable of representing himself but instead were the result of "a nonlawyer defending himself" and the "defendant's possible frustration for his lack of legal knowledge."). At worst, we agree with the trial judge that the defendant's requests demonstrate an intentional "delay tactic" and the defendant's attempt to indefinitely postpone his trial. This is particularly true where the record reflects that the defendant's enthusiasm for the litigation process began to wane only when it became clear that he could no longer delay his trial date. See *People v. Gibson*, 2017 IL App (1st) 143566, ¶ 26 (holding that a defendant's waiver of counsel was not subsequently invalidated by his last-minute requests for the appointment of a public defender where the circuit determined that the defendant was engaging in mere delay tactics).

¶ 74    We similarly disagree with the defendant's position that his refusal to proceed with the

instant trial without the appointment of a *pro bono* lawyer and his continued silence at trial can be equated with his inability to represent himself, triggering the court's duty to hold a *sua sponte* hearing to determine his mental capacity. As already discussed above, the defendant actively engaged in the pretrial litigation, which spanned over five years, including the trial in case No. 14 CR 19077. Throughout this period, he showed himself capable of interacting with others and communicating effectively. The defendant first requested the appointment of a *pro bono* lawyer when it became clear that he could not avoid going to trial on the instant case. The defendant then repeatedly rejected the court's offers to appoint him a public defender, threatened the court with the judicial inquiry board and appellate review, and promised that he would not participate in the trial proceedings. At trial, the defendant made good on this promise. He did not make a spectacle of himself, was not on medication, and did not exhibit any conduct suggesting detachment from reality. Rather, for the most part, he sat silently and observed the proceedings. Any outbursts he made were reserved solely for the trial judge and made outside of the presence of the twelve individuals who would decide the outcome of his trial. This alone attests more to his acumen and self-control than any lack of mental competence.

¶ 75   In sum, the defendant does not fall into the "gray-area" category of mental fitness addressed by *Edwards*. While his decision to represent himself was certainly "foolish and unwise" nothing in the record suggests that it was the result of mental incompetence. *Tatum*, 389 Ill. App. 3d at 671. Accordingly, we cannot find that the circuit court abused its discretion in failing to hold a *sua sponte* hearing to determine his capacity to represent himself. *Id*.; see also *Khan*, 2021 IL App (1st) 190679, ¶ 62. Since we find no error, we also conclude that there is no plain error. See *Sebby*,

2017 IL 119445, ¶ 49.

¶ 76                                    B. Sentencing

¶ 77    On appeal, the defendant next contends that we should vacate his sentence and remand for

a new sentencing hearing where the circuit court relied on an improper aggravating factor in

sentencing him to an aggregate of 105 years' imprisonment. Specifically, the defendant points to

two comments made by the circuit court, namely that his criminal history was "extensive," and

showed him to be a "serial rapist." The defendant contends that because his PSI revealed that his

only felony convictions arose from a single incident (in case No. 14 CR 19077) the court

improperly and subjectively relied on a non-existent "extensive" criminal record as the key

aggravating factor in imposing his sentence.

¶ 78    The State initially notes, and the defendant concedes, that he has forfeited this issue for

purposes of appeal by failing to properly preserve it for review. See *People v. Hall,* 194 Ill. 2d 305,

352 (2000) (To preserve an issue for purposes of appeal, the "defendant was required to make a

contemporaneous objection at the sentencing hearing and to raise the issue in a post-sentencing

motion.") The defendant nevertheless asks this court to review his claim under the second prong

of the plain error doctrine. See Ill. S. Ct. R. 615(a) (eff. Jan.1, 1967); see also *Herron,* 215 Ill. 2d

at 186-87; see also *People v. Reed*, 376 Ill. App. 3d 121, 128 (2007) (consideration of an improper

aggravating factor affects a defendant's fundamental right to liberty and is therefore a basis for

second prong plain-error review).

¶ 79    As already noted above "[t]he first step of plain-error review is to determine whether any

error occurred" at all and whether it was clear or obvious. *People v. Hood*, 2016 IL 118581, ¶ 18;

see also *People v. Wilson,* 404 Ill. App. 3d 244, 247 (2010) ("There can be no plain error if there

was no error at all."). Accordingly, we first review the defendant's claim to determine whether the

circuit court considered an improper aggravating factor in sentencing.

¶ 80    It is axiomatic that the imposition of a sentence is normally within the discretion of the circuit court. *People v. Willis*, 2013 IL App (1st) 110233, ¶ 122. There is a strong presumption that the circuit court based its sentencing determination on proper legal reasoning, such that the court's decision is reviewed with great deference and will not be disturbed absent a showing of an abuse of discretion. *Willis*, 2013 IL App (1st) 110233, ¶ 122; *People v. Dowding,* 388 Ill. App. 3d 936, 942-43 (2009); see also *People v. Fern,* 189 Ill. 2d 48, 53 (1999). The rationale is that the trial court is in a better position to "weigh such factors as the defendant's credibility, demeanor, general moral character, mentality, social environment, habits, and age." *People v. Stacey,* 193 Ill. 2d 203, 209 (2000). A sentence that falls within the statutory range will be presumed proper and not the result of an abuse of discretion. *Id*. The presumption can be rebutted only by an affirmative showing that "the sentence is greatly at variance with the spirit and purpose of the law, or manifestly disproportionate to the nature of the offense." *Id*.; see also *Willis*, 2013 IL App (1st) 110233, ¶ 123; *Fern,* 189 Ill. 2d at 54.

¶ 81    Because a sentencing hearing is an inquiry into pertinent facts and circumstances that enable the circuit court to exercise its discretion in determining the appropriate sentence "[i]n conducting such an inquiry, the court may search anywhere within reasonable bounds for facts which may serve to aggravate or mitigate the offense." *Reed*, 376 Ill. App. 3d at 128 (citing *People v. Irby*, 237 Ill. App. 3d 38, 70 (1992)); see also *People v. Moore*, 250 Ill. App. 3d 906, 919 (1993). The sentencing court therefore may consider all matters reflecting upon the defendant's "personality, propensities, purposes, tendencies, and indeed every aspect of [the] defendant's life relevant to the sentencing proceeding." *Reed*, 376 Ill. App. 3d at 128. Consequently, in addition to his family life, occupation, and criminal record, the court may inquire into the defendant's general

moral character, habits, social environment, abnormal tendencies, age, natural inclination, or aversion to commit crime, and stimuli motivating his conduct. *Moore*, 250 Ill. App. 3d at 919.

¶ 82    Nonetheless, the circuit court may not consider an improper aggravating factor because such a consideration affects the defendant's fundamental right to liberty. *Reed*, 376 Ill. App. 3d at 128. When, as here, we are asked to review a sentence for an alleged error based upon the consideration of an improper aggravating factor, we consider the record as a whole and do not focus merely on a few words or statements from the trial judge. *People v. Brown*, 2019 IL App (5th) 160329, ¶ 18; see also *Reed*, 376 Ill. App. 3d at 128. We do so because " '[a]n isolated remark made in passing, even though improper, does not necessarily require that [the] defendant be resentenced.' " *Reed*, 376 Ill. App. 3d at 128 (quoting *People v. Fort*, 229 Ill. App. 3d 336, 340 (1992)); see also *Brown*, 2019 IL App (5th) 160329, ¶ 18. To be entitled to a remand for resentencing, the defendant must show more than the mere mention of the improper aggravating factor; he must show that the circuit court relied on the improper factor in fashioning his sentence. *Brown*, 2019 IL App (5th) 160329, ¶ 18. "The question of whether a court relied on an improper factor in imposing a sentence ultimately presents a question of law to be reviewed *de novo*. [Citation.]" *People v. Abdelhadi*, 2012 IL App (2d) 111053, ¶ 8 (citing *People v. Chaney*, 379 Ill. App. 3d 524, 527 (2008)).

¶ 83    In the present case, when placed into context, the trial judge's comments were properly made and do not establish the consideration of an improper factor.

¶ 84    Pursuant to section 5-5-3.2(a)(3) of the Unified Code of Corrections (Code of Corrections) the defendant's "history of prior delinquency or criminal activity," whether or not it resulted in a conviction, is a factor that "shall be accorded weight in favor or imposing a term of imprisonment or may be considered by the court as [a reason] to impose a more severe sentence." 730 ILCS 5/5-

5-3.2(a)(3) (West 2018)).

¶ 85    In imposing the sentence below, the circuit court considered the defendant's PSI, which affirmatively established that the defendant had four prior convictions, three misdemeanors and one felony conviction. The misdemeanors included an assault (in 2008) and two sex crimes: (1) public indecency involving a sex act (in 2007) and (2) public indecency/lewd exposure (in 2006). The PSI further revealed that in 2017, in case No. 14 CR 19077, a jury convicted the defendant of, *inter alia*, six counts of aggravated criminal sexual assault and aggravated kidnapping, both Class X felonies. Because the same trial judge presided over that jury trial and the defendant's sentencing hearing in the instant case, he had direct and intimate knowledge of the evidence presented at that trial, which included, *inter alia*, the testimony of two women that they had been repeatedly raped by the defendant in unrelated incidents. See *People v. Joseph*, 2021 IL App (1st) 171026-U, ¶ 2. Moreover, for five years, the same trial judge presided over the defendant's pretrial litigation in four other cases all involving sexual assault charges. Under this record, and taken in context, we find nothing erroneous in the trial judge's comments regarding the defendant's "extensive" criminal record and his statement that it would be fair to characterize the defendant as a "serial rapist." The comments show nothing more than the trial judge's reflection upon the evidence in the PSI and the defendant's general moral character, his abnormal tendencies, his natural inclination to commit crime and his criminal record. See *Moore*, 250 Ill. App. 3d at 919 ("In imposing a sentence the court "may inquire into a defendant's general moral character *** abnormal tendencies *** natural inclination *** to commit crime *** and criminal record."). Accordingly, the defendant has failed in his burden to establish that the circuit court considered an improper aggravating factor in sentencing.

¶ 86    Moreover, a review of the record establishes that the sentence imposed comports with the

spirit of the law and was proportionate to the offenses committed. In Illinois a conviction for aggravated criminal sexual assault is a Class X felony that carries a penalty of 6 to 30 years' imprisonment. 720 ILCS 5/11-1.30  (West 2018); 730 ILCS 5/5-4.5-25(a) (West 2018)). As a recidivist Class X felon, however, the defendant was subject to the statutory extended sentencing range of 30- to 60-years' imprisonment on each of the three counts on which he was convicted. 730 ILCS 5/5-4.5-25(a) (West 2018)). In addition, because the convictions were for aggravated criminal sexual assault the court was required to impose them consecutively. *Id.*; 730 ILCS 5/5-8-4(d)(2) (West 2018).

¶ 87     Here, the circuit court imposed a 35-year sentence on each count. At just 5 years above the allowed minimum, each sentence was not only well-within the permissible sentencing range, but at the very low end of that spectrum. 730 ILCS 5/5-4.5-25(a) (West 2018)). As such, because the sentences imposed were within the statutory range, we must presume that they were proper and not the result of an abuse of discretion. *People v. Busse*, 2016 IL App (1st) 142941, ¶ 27; see also *People v. Hauschild*, 226 Ill. 2d 63, 90 (2007) (a sentence within statutory guidelines is presumptively valid); see also *People v. Tripp*, 306 Ill. App. 3d 941, 956 (1999). Accordingly, because we find no error by the circuit court, we further find that there was no plain error. See *People v. Cox*, 2017 IL App (1st) 151536, ¶ 87 ("Since we find no error by the trial court, there can be no plain error.")

¶ 88                                III. CONCLUSION

¶ 89     For the aforementioned reasons, we affirm the judgment of the circuit court.

¶ 90     Affirmed.